[Cite as *In re J.L.S.*, 2020-Ohio-5143.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| J.L.S. AND B.N.S.,<br>DEPENDENT CHILDREN | : | |
| | | **CASE NOS. 2020-P-0053** |
| | : | **2020-P-0054** |
| | : | |

Civil Appeals from the Portage County Court of Common Pleas, Juvenile Division, Case Nos. 2020 JCF 00201 and 2020 JCF 00202.

Judgment: Affirmed.

*Victor V. Vigluicci*, Portage County Prosecutor, and *Kristin L. Maxwell*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee, Portage County Department of Job and Family Services).

*Cecily J. Mullins*, Megargel, Eskridge & Mullins, LLP, 231 South Chestnut Street, Ravenna, OH 44266 (For Appellant, Dale Straw).

*Neil P. Agarwal*, 3732 Fishcreek Road, #288, Stow, OH 44224 (Guardian ad Litem).

MATT LYNCH, J.

{¶1} Appellant, Dale Straw, appeals from the judgment of the Portage County Court of Common Pleas, Juvenile Division, granting permanent custody of his children, J.L.S. and B.N.S. to appellee, the Portage County Department of Job and Family Services (PCDJFS). For the following reasons, we affirm the decision of the lower court.

{¶2} Straw is the biological father of J.L.S., born September 2, 2016, and B.N.S., born August 8, 2017. The children's biological mother is Tiffany Thomas.

{¶3} On November 7, 2017, a complaint was filed alleging the children were abused, neglected, and dependent due to domestic violence concerns (Thomas striking Straw), lack of safe and stable housing, and failure to provide sufficient medical care. PCDJFS had been working with the family since September 2016, on parenting and mental health issues. The children were placed in the interim custody of PCDJFS on November 15, 2017, and were adjudicated dependent. Temporary custody was granted to PCDJFS on January 12, 2018. The case plan required Straw to complete a parenting evaluation and classes, engage in mental health services, and maintain safe housing. Pursuant to a January 31, 2019 Agreed Judgment Entry, legal custody of the children was returned to Thomas and Straw under an order of protective supervision. Protective supervision was terminated on April 26, 2019.

{¶4} On June 20, 2019, PCDJFS again filed a complaint alleging the children were abused, neglected and dependent, noting that they were removed from their parents' custody on June 19 due to a lack of housing. A June 25, 2019 entry was issued placing the children in the interim custody of PCDJFS. The children were adjudicated dependent on July 23, 2019, and a case plan filed on that date required, inter alia, Straw to maintain a source of income and a safe home for the children. Following a subsequent dispositional hearing, the court issued an August 23, 2019, entry awarding temporary custody of the children to PCDJFS. PCDJFS filed an Amended Motion for Permanent Custody on May 12, 2020. It requested termination of parental rights given the parents' failure to complete the case plan objectives and the lack of a safe and stable environment for the children.

{¶5} A hearing on the motion for permanent custody was held on May 22 and

2

29, 2020. Prior to the commencement of testimony, Thomas surrendered her parental rights. The following testimony was then presented.

{¶6} Danielle McGarvey, a case worker with PCDJFS, testified that a voluntary case plan involving J.L.S. began in 2016 due to mental health, domestic violence, and housing concerns and the failure to follow through with J.L.S.'s medical care. PCDJFS filed for temporary custody in November 2017 due to ongoing concerns with these issues and failure to seek follow up medical care for B.N.S.

{¶7} McGarvey testified that the case plan objectives in 2017 were for Straw to establish housing, complete a parenting evaluation, and address mental health concerns. Straw completed the evaluation and parenting classes but failed to complete counseling. During PCDJFS' involvement with the children, Straw, Thomas, and the children moved several times, living with different family members. The children were returned to Straw and Thomas on February 1, 2019, following substantial compliance with the case plan.

{¶8} Alex Bevere, a PCDJFS caseworker, became involved when the children were returned to PCDJFS' custody in June 2019. She testified that, at that time, the family was homeless and the children had been living with their parents in a tent for about three days, after they had previously been living with Thomas' uncle. Bevere testified that there were concerns about Thomas' and Straw's mental health and a lack of follow through with treatment. Bevere prepared a July 23, 2019 case plan which required Straw to obtain housing and employment and engage with Coleman Professional Services for mental health services. When asked about the reason Straw was referred to mental health counseling, she stated: "the mental health of his point with the anxiety and the depression, of him not having the kids was reported to me by Pam Yeager" (sic) and that

3

the agency wanted him to be able to cope with "anger" and anxiety.

{¶9} Bevere testified that during the duration of the 2019 case plan leading up to the permanent custody hearing, Straw and Thomas had been staying at the Eastwood Motel in Kent, Ohio, with the exception of one month where they lived with Thomas' mother until being asked to leave due to domestic violence, and some weeks where they lived "on the streets." According to Bevere, she sometimes had difficulty locating them because they were back and forth between the motel and the streets. Bevere testified Straw had difficulty getting housing through the Portage Metropolitan Housing Authority due to past evictions and a criminal record and told her on several occasions that he had housing when that was not the case. Bevere testified that Straw reported employment at McDonald's starting in July 2019 but did not provide paystubs until November or December 2019. Bevere also expressed concern with Straw's lack of transportation, which he provided as a justification for failing to attend counseling appointments.

{¶10} Bevere testified that there were two to four domestic violence incidents where police were called to the Eastwood Hotel and Thomas was the aggressor. According to Bevere, Thomas and Straw were still a couple and residing together at the time of the permanent custody hearing.

{¶11} Regarding visitation, Bevere indicated that Straw attended 22 of 25 offered supervised visits since July 2019, where he was engaged with the children, whom she opined viewed him as a "fun adult" rather than a parent. She testified that the children are bonded with each other and their foster parents but not with any maternal or paternal relatives. Bevere believed unification with Straw was unlikely because he lacked stable housing throughout the case and was not consistent with mental health counseling.

4

{¶12} Pam Yeager, a therapist at Coleman, met with Straw during four appointments from Summer 2019 into February 2020, working with him on issues including substance abuse, housing, and coping skills. Straw missed ten scheduled appointments. She believed he missed appointments due to "housing issues" as he was homeless and had difficulty getting to the office. Although Coleman has a policy to discharge patients who had three missed appointments, she felt he deserved "another chance" and "was making progress in some of his goals." After the four appointments with her, he "had more insight" and also had reported that he had found housing after their last appointment in February 2020. She stopped seeing patients in March due to the COVID-19 pandemic but continued with telephone appointments, although she did not believe Straw had scheduled any telephone appointments.

{¶13} Straw testified that in June 2019, their lease expired, the landlord asked them to leave, and he had been laid off from his job. The family then stayed at his brother's home for two weeks. He contacted a homeless shelter, which said he needed to have a hotel room. He testified that he asked PCDJFS for a payment voucher to rent a hotel room at which time they removed the children from his custody. He stated that the family had not been living in a tent but had gone camping around this time period.

{¶14} Straw testified that he began working at McDonald's in July 2019 and is employed as a manager working 40-70 hours a week. He presented paystubs which showed his employment at McDonald's from November 2019 to May 2020.

{¶15} As to housing, Straw testified regarding multiple attempts he made to obtain an apartment. In July and August of 2019, he did not have the funds necessary to pay rent. In November, a place he had set up to rent was given to another renter while he

5

was seeking rent assistance. In January 2020, he needed a cosigner to rent a property but his father, who was to cosign, passed away. Straw testified that although he had a gross sexual imposition conviction in 1999, this did not prevent him from renting apartments. Straw testified that he had been living consistently at the Eastwood Motel from December 2019 through May 2020, with Thomas, although they ended their relationship in October 2019. He testified that he had applied to buy a trailer in a Trumbull County trailer park before COVID became a concern, had been approved for the trailer on May 3, 2020, but that he was waiting to sign the paperwork, as the process had been delayed by COVID.

{¶16} Regarding counseling, he testified that he believed he had missed only three appointments and that they had been canceled by the counselor. He had a phone appointment scheduled for an upcoming date.

{¶17} Straw testified that he had been working hard to get his children back and had a plan for the children's grandmother, who lived in the trailer park where he intended to purchase the trailer, to watch them while he is at work. He testified that the children had communicated to him a desire to "come home."

{¶18} The guardian ad litem, Neil Agarwal, recommended permanent custody be granted to PCDJFS.[1] He noted that Straw did not currently have a living situation suitable for the children and would have difficulty caring for them with his present employment. He stated that Straw loves the children and they have fun during visitation but need more than a "fun time father." He believes the children see the foster parents as their parents.

---

1. While Straw notes in the fact section of his appellate brief that the trial court declined to swear-in Agarwal or "have him * * * be subject to cross-examination," no error is alleged regarding this issue. Furthermore, the court asked counsel for both sides if they wished to question Agarwal after he gave his recommendation, which Straw's counsel declined to do.

{¶19} On June 1, 2020, the trial court issued a Journal Entry granting permanent custody of the children to PCDJFS. The court found that the children had been in the custody of children's services for approximately 18 of the prior 22 months. It determined that reunification with Straw is unlikely due to his inability to complete the case plan, including addressing his "anger issues," obtaining counseling, and finding safe and stable housing. It found it was in the children's best interest that Straw's parental rights be permanently terminated.

{¶20} Straw timely appeals and raises the following assignment of error:

{¶21} "The trial court's award of permanent custody to the Portage County Department of Jobs and Family Services was against the manifest weight and sufficiency of the evidence."

{¶22} "It is well established that a parent's right to raise a child is an essential and basic civil right." *In re T.B.*, 11th Dist. Lake No. 2008-L-055, 2008-Ohio-4415, ¶ 29, quoting *In re Phillips*, 11th Dist. Ashtabula No. 2005-A-0020, 2005-Ohio-3774, ¶ 22; *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Termination of parental rights has been described as "the family law equivalent of the death penalty." (Citations omitted.) *State v. Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. However, "[t]he rights of a parent to his or her child, while fundamental, 'are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" (Citation omitted.) *In re L.M.R.*, 11th Dist. Lake No. 2016-L-096, 2017-Ohio-158, ¶ 33, citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979). "Although the termination of the rights of a natural parent should occur as a last resort, termination is expressly authorized when necessary for the welfare of the child."

*Id.*

{¶23} "R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody." *In re Krems*, 11th Dist. Geauga No. 2003-G-2535, 2004-Ohio-2449, ¶ 33. The court must find 1.) that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) is present and 2.) that it is in the best interest of the child to grant permanent custody to PCDJFS. R.C. 2151.414(B)(1).

{¶24} In this case, the court found that, pursuant to R.C. 2151.414(B)(1)(d), the children had been in the custody of PCDJFS for 18 months of a consecutive 22 month period, when considering the two separate periods of temporary custody, thereby satisfying the first prong. Straw does not refute that this factor was properly demonstrated by PCDJFS; he contends that the determination that it was in the best interest of the children for permanent custody to be granted to PCDJFS was not supported by the weight and sufficiency of the evidence.

{¶25} A determination that it is in the best interest of the children to grant permanent custody to the children's services agency must be supported "by clear and convincing evidence." R.C. 2151.414(B)(1); *Matter of C.N.L.*, 11th Dist. Lake No. 2020-L-036, 2020-Ohio-3771, ¶ 12; *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985); *In re J.S.E.*, 11th Dist. Portage Nos. 2009-P-0091 and 2009-P-0094, 2010-Ohio-2412, ¶ 25 ("we will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence") (citations omitted). In applying a clear and convincing evidence standard, the evidence must "'produce in the mind of the trier of facts a firm

8

belief or conviction as to the facts sought to be established. * * * Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.'" *C.N.L.* at ¶ 12, citing *Holcomb* at 368.

{¶26} Regarding Straw's contention that the court's judgment is not supported by the weight of the evidence, "'[a] reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence.'" *Matter of N.M.P.*, 2018-Ohio-5072, 126 N.E.3d 200, ¶ 54 (11th Dist.), citing *In re D.M.*, 4th Dist. Hocking No. 15CA22, 2016-Ohio-1450, ¶ 10 (citations omitted). To apply this standard, the appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *N.M.P.* at ¶ 54. "'Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.'" *In re D.H.*, 11th Dist. Ashtabula No. 2017-A-0081, 2018-Ohio-630, ¶ 18, quoting *In re West*, 4th Dist. Athens No. 05CA4, 2005-Ohio-2977, ¶ 37.

{¶27} In evaluating the entirety of the evidence presented in conjunction with the best interest factors, we find that the court's decision to terminate Straw's parental rights was supported by the weight of the evidence and clear and convincing evidence.

{¶28} In determining the best interest of the children, a court shall consider "all

9

relevant factors, including, but not limited to: the interaction and relationship of the child with his parents, siblings, relatives, and foster caregivers; the wishes of the child with regard for his maturity; the custodial history of the child; the child's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency"; and other factors that do not appear to be relevant in the present matter, such as a conviction for certain criminal offenses, withholding food or medical treatment, drug abuse, abandonment, and prior termination of parental rights. R.C. 2151.414(D)(1)(a)-(e) and (E)(7)-(11).

{¶29} Here, testimony was presented that, due to the age of the children, who were only two- and three-years-old at the time of the trial, they could not express their wishes. Thus, this factor does not weigh into our consideration.

{¶30} As to the custodial history, the children had been in the custody of PCDJFS for approximately 18 of the 22 months preceding the filing of the motion for permanent custody, a factor that is of significant importance in this case, since the children had spent a large portion of their lives in the custody of PCDJFS. This factor is also interrelated with that of the children's relationships. It was indicated by multiple parties that the children found Straw to be a "fun adult" rather than a parent. While it is true that Straw believed he was bonded with the children and that the children did enjoy their time with him, PCDJFS caseworker Bevere did not believe they had a father-child bond, nor was there a bond with any maternal or paternal relatives. Significantly, the children are bonded with each other and with the foster parents they have lived together with for 11 months. That bond was not questioned by any of the witnesses.

{¶31} Regarding the ability to achieve a permanent placement with Straw, the

10

circumstances of the present case also indicate this weighs in favor of granting permanent custody to PCDJFS. PCDJFS has been working with Straw and the children in some capacity for almost the entirety of both children's lives. When the children were returned to Straw's custody in 2019, they remained there for approximately five months and less than two months after protective supervision had been terminated. Of particular concern is Straw's repeated inability to obtain stable and secure housing for the children. Throughout the past several years, he and Thomas moved from relative to relative. When the children were removed from their custody due to housing concerns, Straw repeatedly made claims to caseworkers that he was about to obtain housing but failed to ever produce concrete evidence of doing so. Instead, during the year preceding the termination hearing, he was living in a motel, an environment not suitable for the children. While Straw testified at the hearing that he was making arrangements to purchase and move into a mobile home, and that he would be able to sign the lease and move in on the Tuesday or Wednesday following the hearing (held on Friday, May 22), he did not present documentation to prove this statement. While a second hearing was held on May 29 to address a paystub issue, Straw made no attempts to prove that he had completed the agreement to purchase the trailer or had moved in, either through testimony or documentation. If he had obtained housing, consistent with the testimony he had previously given, he could have sought to introduce evidence or testimony to that fact, but he failed to do so.

{¶32} There were also legitimate concerns that, although PCDJFS required Straw to complete counseling for various issues, testimony demonstrated he failed to attend ten scheduled appointments, evidencing a lack of commitment to completing the case plan.

11

Further, while Straw may not have been the aggressor in the domestic violence incidents with Thomas, testimony indicated that he continued to live with her and that the two frequently argued, another concern that could negatively impact the children.

{¶33} Straw emphasizes that he should be given additional time to achieve compliance with the case plan and obtain and prepare stable housing for the children. While it is unfortunate that termination of parental rights is necessary as we do not question Straw's desire to have custody of the children, this court has repeatedly emphasized the need to provide permanence for children and the inability of the court to allow an indefinite period for case plan completion. Speculative future plans do not justify failure to terminate parental rights when it is in the children's best interest. *See In re A.J.P.-H.*, 11th Dist. Lake Nos. 2017-L-019 et al., 2017-Ohio-5515, ¶ 68 ("[a]lthough [mother] believes she can provide a stable environment for the children, this is speculative and, again, has not been accomplished over the more than two-year period that they were not in her custody"); *In re B.R.C.*, 11th Dist. Portage Nos. 2013-P-0059 and 2013-P-0060, 2014-Ohio-69, ¶ 49, citing *In re N.A.P.*, 5th Dist. Washington Nos. 12CA30 and 12CA31, 2013-Ohio-689, ¶ 40 ("[T]he lower court's holding that it was in the children's best interest to be placed with children's services must be affirmed when, at the time of the permanent custody hearing, the appellant maintained that, upon his release from a correctional facility, he would obtain secure housing, since this assertion was unproven and speculative. In light of past factors, and the children's need for stability, they should not have their lives subjected to uncertainty, especially when considering the appellant's past inability to provide a home."); *In re L.M.* 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 50.

{¶34} While Straw argues that the courts should take into account his "continuous" progress, including maintaining a full time job and making progress in counseling sessions, as noted above, there are still significant portions of the case plan that are incomplete, including counseling and, most importantly, proof of and access to stable housing. Regardless, completion of case plan goals alone does not determine whether to grant a motion for permanent custody as the best interests are paramount. *In re A.J.P.-H.* at ¶ 67.

{¶35} Finally, Straw argues that he was a "victim" of the COVID pandemic, noting it impacted his counseling appointments and ability to obtain housing. Straw, however, failed to comply with requirements to obtain housing and complete counseling well before COVID became a concern. Over the course of multiple years prior to 2020, he struggled to maintain safe housing. He had many months before COVID under the most recent case plan to obtain housing. As noted above, although he stated there was a delay in obtaining the mobile home due to COVID, he testified the process was essentially complete yet did not provide paperwork or other evidence to back up this claim. As to counseling, it is evident telephone appointments were available but Straw failed to take advantage of these. The children should not remain in limbo because of Straw's failure to take initiative to provide them a safe home and COVID cannot excuse his inaction.

{¶36} When reviewing each of the factors considered by the lower court and the evidence as a whole, the court's decision was supported by clear and convincing evidence and its determination was not against the weight of the evidence. Given the serious concerns regarding housing, regardless of Straw's contention that he has made progress, we emphasize that "it was the General Assembly's purpose in establishing the

13

present procedures for the termination of parental rights 'to prevent children from lingering in foster care,'" especially here where the children can be adopted by the foster family with which they are bonded. (Citation omitted.) *In re J.G.*, 11th Dist. Lake No. 2015-L-102, 2016-Ohio-896, ¶ 77.

{¶37} The sole assignment of error is without merit.

{¶38} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas, Juvenile Division, granting permanent custody of J.L.S. and B.N.S. to PCDJFS, is affirmed. Costs to be taxed against appellant.

TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.