[Cite as *In re V.J.P.*, 2021-Ohio-1778.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

LAKE COUNTY, OHIO


| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| V.J.P., II, DEPENDENT CHILD | : | |
| | : | **CASE NO. 2020-L-123** |
| | : | |
| | : | |
| | : | |


Civil Appeal from the Lake County Court of Common Pleas, Juvenile Division.
Case No. 2019 DP 00613.

Judgment: Affirmed.


*Charles E. Coulson*, Lake County Prosecutor; *Kristi L. Winner* and *Sarah R. Hronek*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Appellee, Lake County Department of Job and Family Services).

*Josephine L. Begin*, Manning & Clair, Attorneys at Law, 38040 Euclid Avenue, Willoughby, OH 44094 (For Appellant, Cassandra Gore).

*Maureen A. Sweeney*, 11805 Girdled Road, Painesville, OH 44077 (Guardian ad litem).


MARY JANE TRAPP, P.J.

{¶1} Appellant, Cassandra Gore ("Ms. Gore"), appeals the judgment of the Lake County Court of Common Pleas, Juvenile Division, granting permanent custody of her minor child, V.J.P., II ("V.P."), to appellee, the Lake County Department of Job and Family Services ("LCDJFS").

{¶2}   Ms. Gore contends that the trial court's determination that it was in the best interest of V.P. to grant permanent custody to LCDJFS was against the manifest weight of evidence.

{¶3}   After a thorough review of the record, we find that it contains substantial competent and credible evidence supporting the trial court's best-interest findings. Therefore, the trial court's best-interest determination is not against the manifest weight of the evidence.

{¶4}   Thus, we affirm the judgment of the Lake County Court of Common Pleas, Juvenile Division.

## Substantive and Procedural History

{¶5}   Ms. Gore is the biological mother of V.P., and her fiancé, Andrew Pizzino ("Mr. Pizzino"), is the child's biological father. Ms. Gore and Mr. Pizzino are also the biological parents of another child, who was born in May 2015. The trial court granted permanent custody of this child to LCDJFS in August 2016.

### *Emergency/Temporary Custody*

{¶6}   Ms. Gore gave birth to V.P. on May 8, 2019. V.P. was born premature and was treated in the neonatal intensive care unit for a period of time because of medical complications. At the hospital, Ms. Gore and Mr. Pizzino got into an argument where Mr. Pizzino threw food across the room and hospital security intervened.

{¶7}   LCDJFS moved for and obtained emergency temporary custody of V.P. on May 24, 2019, based on reported concerns regarding Ms. Gore's and Mr. Pizzino's mental health, past history of significant domestic violence, and housing instability. V.P. was placed in a certified foster home the next day.

2

{¶8} LCDJFS filed a complaint in the trial court alleging that V.P. was a dependent child. The trial court appointed counsel for Ms. Gore and Mr. Pizzino and appointed Attorney Maureen Sweeney as the guardian ad litem ("GAL") for V.P.

{¶9} Robin Suminguit ("Ms. Suminguit") from LCDJFS was assigned as the family's case worker. She met with Ms. Gore and Mr. Pizzino to review the case plan, which included the following goals for both of them: (1) initiating and completing a mental health assessment with a qualified service provider and following all recommendations; (2) participating in a parenting education program with a qualified service provider and following all recommendations; and (3) finding appropriate, stable, safe, and long-term housing.

{¶10} On July 25, 2019, the trial court held an adjudication hearing, at which Ms. Gore and Mr. Pizzino agreed that V.P. was a dependent child. The trial court granted temporary custody to LCDJFS and adopted the case plan as a court order.

### Housing/Employment

{¶11} At the time of V.P.'s birth, Ms. Gore and Mr. Pizzino resided with Ms. Gore's sister in Mentor-on-the-Lake. After a physical altercation between Ms. Gore and her niece, the couple moved in with a person they referred to as their "street mom" in Painesville. The couple eventually had a verbal altercation with their "street mom," became homeless, and began living in a tent at an unidentified location in Lake County. At one point, Ms. Gore and Mr. Pizzino separated romantically, and Ms. Gore's new boyfriend lived with both of them in the tent.

3

{¶12} In late December 2019, Ms. Gore and Mr. Pizzino travelled to Xenia, Ohio, to visit Mr. Pizzino's family. Ms. Gore returned a few weeks later, but Mr. Pizzino decided to stay in Xenia to live. In mid-January 2020, Ms. Gore also moved to Xenia.

{¶13} In Xenia, Ms. Gore and Mr. Pizzino moved in with Mr. Pizzino's mother, Mary Yount ("Ms. Yount"), who resided with her husband, as well as her husband's brother, wife, and two young children. The brother is a registered sex offender involving a child under the age of 11.

{¶14} Ms. Yount eventually leased her own house, and Ms. Gore and Mr. Pizzino moved in with her. Ms. Yount's husband initially lived with them, but due to conflict with Ms. Gore and Mr. Pizzino, he moved back in with his brother. Ms. Yount is the lessee under the lease, and she pays the monthly rent. According to Mr. Pizzino, he helps with paying bills.

{¶15} While living in Lake County, Mr. Pizzino was employed part-time at Arby's, and Ms. Gore was unemployed. After moving to Xenia, Mr. Pizzino became employed part-time at McDonald's. Ms. Gore also worked at McDonald's but was terminated after a co-worker found a syringe in the bathroom that Ms. Gore had used to inject herself with heroin. Ms. Gore was subsequently terminated from employment at three other fast-food restaurants in Xenia.

{¶16} Ms. Yount provides the primary financial support for the family in Xenia. She previously worked full time for a substance abuse facility but lost her job and began working at McDonald's with Mr. Pizzino. Ms. Gore and Mr. Pizzino reported to Ms. Suminguit that money was "very tight" and that they had to borrow money from their pastor to travel from Xenia to Painesville to attend the permanent custody hearing.

### Mental Health Services

{¶17} Prior to the adoption of the case plan, Mr. Pizzino obtained a diagnostic assessment from Kelly Christy ("Ms. Christy") at Signature Health. He reported past diagnoses of bipolar disorder and schizoaffective disorder. Ms. Christy recommended that he follow up with a prescriber for a psychiatric evaluation and obtain individual counseling.

{¶18} Ms. Christy was also Mr. Pizzino's counselor for a period of time. She indicated that his physical presence was consistent with someone who had a severe mental illness, including poor hygiene, oddity in his behavior and presentation, and emerging anger. During one session, she tried to understand why he and Ms. Gore were not able to obtain or secure stable housing. Mr. Pizzino became angry and abruptly walked out of the session. At another session, Mr. Pizzino appeared with a black eye, indicating he had been "jumped" by somebody but did not press charges. He also reported arguments between himself and Ms. Gore, including one argument that escalated to the point where he pushed her.

{¶19} Ms. Gore also obtained a diagnostic assessment at Signature Health. The assessment report listed tentative diagnoses of PTSD and schizoaffective disorder and recommended that Ms. Gore receive a psychiatric/medication evaluation and counseling.

{¶20} Signature Health's records indicate that both Ms. Gore and Mr. Pizzino either cancelled or did not attend several scheduled appointments. In addition, both Ms. Gore and Mr. Pizzino were hospitalized on separate occasions at Windsor Laurelwood because of suicidal behavior, with Ms. Gore being hospitalized twice.

{¶21} On November 8, 2019, LCDJFS filed motions to show cause in the trial court based on Ms. Gore's and Mr. Pizzino's noncompliance with their mental health goals.

{¶22} Ms. Gore subsequently obtained a psychiatric evaluation at Signature Health. The assessment report listed a past history of ADHD, multiple personality disorder, schizoaffective, and paranoid schizophrenia. Ms. Gore reported seeing things other people do not see and hearing voices that, at times, commanded her to harm herself or others. The report also listed a past history of heroin use as well as a relapse after four years of sobriety.

{¶23} On January 28, 2020, the trial court held a hearing on LCDJFS's motions to show cause. By this time, Ms. Gore and Mr. Pizzino had moved to Xenia and did not appear. The trial court found them in contempt and ordered them to reinstate services in Xenia within 14 days.

{¶24} Mr. Pizzino reinstated mental health services in Xenia at TCN Behavioral Health ("TCN") and medication/psychiatry at Soin Family Health ("Soin"). He successfully completed a wellness group at TCN without further recommendation, and he was prescribed medication at Soin. He did not contact Soin for follow up services until after LCDJFS filed its motion for permanent custody.

{¶25} Ms. Gore did not reinstate services in Xenia within 14 days. After missing a scheduled appointment for a diagnostic assessment, Ms. Gore left an "irate" message at the provider's office.

{¶26} On March 3, 2020, LCDJFS filed a motion to impose sentence upon Ms. Gore. Ms. Gore eventually reinstated mental health services at TCN and medication/psychiatry at Soin. At her mental health assessment at TCN, Ms. Gore

reported her heroin relapse at McDonald's and also tested positive for THC. Ms. Gore was scheduled to participate in an intensive outpatient program ("IOP") treatment plan, seek outpatient psychiatric medication management services, and begin individual counseling services.

{¶27} Ms. Gore subsequently missed 12 IOP sessions. After she was transferred to a dual diagnoses group, she missed 11 out of 22 of those sessions. She also missed appointments for her counseling sessions. She attended her appointments at Soin.

{¶28} According to TCN's records, Ms. Gore reported hearing her deceased mother's voice "all the time" and once shared that she had not been taking her medications. In one report, the provider wrote, "Client appears to have few healthy living skills or coping skills and insight is limited."

### *Visitation*

{¶29} When Ms. Gore and Mr. Pizzino lived in Lake County, they had in-person visitation time with V.P. twice a week. After moving to Xenia, Ms. Gore and Mr. Pizzino visited V.P. in-person on two occasions, in March and August 2020, when they were in Lake County for court hearings. Ms. Gore and Mr. Pizzino do not own a vehicle or have driver's licenses.

{¶30} LCDJFS suspended in-person visits due to COVID-19 and offered virtual visits. Ms. Gore and Mr. Pizzino participated in virtual visits with V.P., which were held once a week for 10 to 15 minutes and were monitored by V.P.'s certified foster parents. Due to V.P.'s young age, he was not able to meaningfully communicate. According to Ms. Suminguit, Ms. Gore and Mr. Pizzino did not have enough in-person visits for her to say that V.P. developed a bond or attachment with them.

7

## Parenting Skills Education

{¶31} According to Ms. Suminguit, hands-on parenting was key for Ms. Gore and Mr. Pizzino because they had not cared for a baby in quite some time. When Ms. Gore and Mr. Pizzino lived in Lake County, Ms. Suminguit referred them to Karla Mendez ("Ms. Mendez") from Crossroads Health ("Crossroads") for instruction on parenting skills, which occurred during their visitation time with V.P.

{¶32} When Ms. Mendez became involved, V.P. was two months old. She provided Ms. Gore and Mr. Pizzino with information regarding basic infant care, such as reading V.P.'s cues and meeting his basic needs. Both Ms. Suminguit and Ms. Mendez reported that it was difficult for Ms. Gore and Mr. Pizzino to read V.P.'s cues. During one of V.P.'s feedings, Ms. Gore would not remove V.P.'s bottle even though he did not want to take it and milk was spilling out the side of his mouth.

{¶33} Both Ms. Suminguit and Ms. Mendez also reported concerning behavior during these sessions. On one occasion, Ms. Gore was swinging V.P. up and down and accidentally hit his head on the wall. On other occasions, Ms. Gore became aggressive and raised her voice with Ms. Mendez during her instruction. Ms. Gore once became so upset with Ms. Mendez or Ms. Suminguit that she asked Mr. Pizzino to take V.P. because she did not want to accidentally hurt him.

{¶34} Ms. Mendez and Ms. Suminguit also had to instruct Ms. Gore to allow Mr. Pizzino to have some time with V.P. so he could also learn the parenting skills.

{¶35} Ms. Mendez concluded that her parenting education with Ms. Gore and Mr. Pizzino was not successful because she did not see them put the information she provided into practice during any of the visits unless prompted or suggested. In addition,

despite V.P.'s development, Ms. Gore and Mr. Pizzino continued to treat him as if he were a two-month-old. Ms. Mendez also did not observe the couple putting V.P.'s needs over their own personal interests.

{¶36} Ms. Gore and Mr. Pizzino had not completed the parenting services goal in their case plan prior to moving to Xenia. Ms. Suminguit provided Ms. Gore a list of service providers in Xenia.

{¶37} Ms. Gore contacted Amber Benton ("Ms. Benton") from Family and Children First to enroll in its six-week parenting class. Due to COVID-19, the classes were held on Zoom for an hour as opposed to the typical two-hour, in-person classes. As a result, the program's attendance policies were very strict.

{¶38} Ms. Gore and Mr. Pizzino participated in the first class. According to Ms. Benton, Ms. Gore was very engaged. Mr. Pizzino appeared to be lying down and rolled his eyes during portions of the class.

{¶39} Ms. Gore attended the second class but indicated that Mr. Pizzino could not attend because he was working. Ms. Benton informed her that it was Mr. Pizzino's responsibility to call if he was not going to attend. Ms. Gore became very upset, used profanity, and disconnected the Zoom call.

{¶40} Ms. Gore later called Children and Family First to re-enroll in the classes. Ms. Benton's supervisor was not willing to permit Ms. Gore and Mr. Pizzino to return to the class. Ms. Gore became very upset, began shouting, and used profanity. Ms. Gore and Mr. Pizzino did not complete a different parenting course in Xenia.

9

### *V.P.'s Foster Placement*

**{¶41}** V.P. has resided with the same certified foster parents since he was two weeks old. V.P. initially required numerous doctors' appointments but has no current health issues. V.P.'s foster parents have also held visits between V.P. and his sibling. V.P.'s foster parents intend to adopt him in the event LCDJFS obtains permanent custody. According to Ms. Suminguit, V.P. appears to have bonded with his foster parents.

### *Permanent Custody Proceedings*

**{¶42}** In August 2020, LCDJFS filed a motion for permanent custody of V.P.

**{¶43}** The GAL filed a report, findings, and recommendation, in which she concluded that it would be in V.P.'s best interest to grant permanent custody to LCDJFS.

**{¶44}** The trial court held an evidentiary hearing on November 16, 2020. LCDJFS, Ms. Gore, and Mr. Pizzino all appeared with their respective counsel, and the GAL also appeared.

**{¶45}** LCDJFS presented the testimony of Ms. Suminguit from LCDJFS; Ms. Christy from Signature Health; Ms. Mendez from Crossroads; Ms. Benton from Family and Children First; and one of V.P.'s certified foster parents. LCDJFS also submitted certified copies of Ms. Gore's and Mr. Pizzino's medical records and the prior journal entry terminating the couple's parental rights to V.P.'s sibling.

**{¶46}** Ms. Suminguit testified that it would be in V.P.'s best interest to grant permanent custody to LCDJFS due to Ms. Gore's and Mr. Pizzino's inconsistencies with their case plan goals. She reported concerns regarding the couple's ability to keep appointments and take care of their mental health so that they are stable enough to care for V.P., as well as their lack of parenting skills, financial stability, and bonding and

attachment with V.P. She acknowledged that Ms. Gore's and Mr. Pizzino's current housing appeared to be appropriate and that they had some supplies for V.P.

{¶47} Ms. Gore and Mr. Pizzino both testified at the hearing.

{¶48} Ms. Gore testified that it would be in V.P.'s best interest to come home with Mr. Pizzino and her. She stated that she and Mr. Pizzino had "grown up enough" to take care of V.P.; their house is suitable; they have supplies, including a car seat, crib, clothes, diapers, and shoes, although she acknowledged that they forgot to bring the car seat with them; and they have food stamps to obtain food for V.P. Ms. Gore indicated that her prior noncompliance with the case plan occurred as a result of medical reasons and work commitments.

{¶49} Mr. Pizzino testified that he would like to take V.P. home with him that day. He stated that he and Ms. Gore have adequate space and income, including assistance from their church and Ms. Yount. When asked why he did not comply with his case plan, Mr. Pizzino responded that he did the best he could while trying to work as much as possible to save money.

{¶50} The GAL did not provide testimony but indicated that she stood by the recommendation in her report.

{¶51} Following closing arguments, the trial court issued its ruling from the bench, finding by clear and convincing evidence that it was in the best interest of V.P. that permanent custody be granted to LCDJFS and granting LCDJFS's motion for permanent custody.

{¶52} The trial court subsequently filed a lengthy judgment entry in which it set forth its summary of the evidence and made statutory findings. The trial court found by

11

clear and convincing evidence, based upon the testimony and evidence presented and the recommendation of the GAL, that it was in the best interest of V.P. that permanent custody be granted to LCDJFS. Accordingly, the trial court granted LCDJFS's motion for permanent custody, committed V.P. to the permanent custody of LCDJFS, and completely and permanently divested Ms. Gore's and Mr. Pizzino's parental rights.

{¶53} Ms. Gore and Mr. Pizzino both filed notices of appeal.[1] Ms. Gore presents the following assignment of error for our review:

{¶54} "The trial court's finding that V.P. II's best interests would be served by granting the Lake County Department of Job and Family Services permanent custody of him was against the manifest weight of evidence because a legally secure permanent placement for V.P. II could have been achieved without a grant of permanent custody to DJFS."

**Standard of Review**

{¶55} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *In re N.M.P.*, 2018-Ohio-5072, 126 N.E.3d 200, ¶ 54 (11th Dist.). To apply this standard, the appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

---

1. Mr. Pizzino is the appellant in the companion case of *In re V.J.P., II*, 11th Dist. Lake No. 2020-L-124.

{¶56} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

## Legal Principles

{¶57} It is well established that a parent's right to raise a child is an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). The permanent termination of parental rights has been described as "'the family law equivalent of the death penalty in a criminal case.'" *Id.*, quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Based upon these principles, the Supreme Court of Ohio has determined that a parent must be afforded every procedural and substantive protection the law allows. *Id.*

{¶58} While the rights of a parent to his or her child are fundamental, they are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed. *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). Although the termination of the rights of a natural parent should occur as a last resort, termination is expressly authorized when necessary for the welfare of the child. *In re L.M.R.*, 11th Dist. Lake No. 2016-L-096, 2017-Ohio-158, ¶ 33.

## Statutory Requirements

{¶59} The trial court must apply a two-pronged analysis when ruling on a motion for permanent custody. *In re Krems*, 11th Dist. Geauga No. 2003-G-2535, 2004-Ohio-2449, ¶ 33. The trial court may grant permanent custody of a child to the movant if the court determines at the hearing, by clear and convincing evidence, that (1) one of the

13

factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies, and (2) it is in the best interest of the child. R.C. 2151.414(B)(1). "[C]lear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Krems* at ¶ 36.

{¶60} In determining the best interest of a child, the trial court shall consider "all relevant factors, including, but not limited to, the following:

{¶61} "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶62} "(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶63} "(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

{¶64} "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶65} "(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(a)-(e).

{¶66} Also relevant here is R.C. 2141.414(E)(11), which involves whether "[t]he parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section * * *, and the parent has failed to provide clear and convincing

14

evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child."

{¶67} The Supreme Court of Ohio has held that "[t]he statute requires a weighing of all the relevant factors." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64. However, "[t]here is not one element that is given greater weight than the others." *Id.* at ¶ 56.

**The Trial Court's Judgment**

{¶68} The trial court made the following statutory findings in its judgment entry:

{¶69} Pursuant to R.C. 2151.414(B)(1)(d), V.P. has been in the temporary custody of LCDJFS for at least 12 out of the last 22 months.

{¶70} Pursuant to R.C. 2151.419(A)(2)(e), LCDJFS was not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home, since Ms. Gore and Mr. Pizzino had their parental rights terminated with respect to V.P.'s sibling. However, LCDJFS did make reasonable efforts by preparing a case plan, with which Ms. Gore and Mr. Pizzino consistently failed to comply.

{¶71} Pursuant to R.C. 2151.414(D)(1), it is in the best interest of V.P. that permanent custody be granted to LCDJFS based on a consideration of all relevant factors set forth in subsections (a) through (e).

{¶72} Under subsection (a), V.P. does not have a strong relationship with Ms. Gore and Mr. Pizzino due to them residing in Xenia for several months, resulting in few

15

in-person visits and limited video visitation. V.P. is strongly bonded to his foster parents, who have been his caretakers since his discharge from the hospital after his birth.

{¶73} Under subsection (b), V.P. does not have the skills to communicate his thoughts or feelings regarding permanent custody due to his age. However, he has established a bond with his caregivers, with whom he has resided since his release from the hospital. In addition, the GAL has recommended that granting permanent custody to LCDJFS is in V.P.'s best interest.

{¶74} Under subsection (c), LCDJFS was granted emergency custody of V.P. while he was in the hospital. Thereafter, V.P. was placed in a certified foster home, where he has remained since his placement.

{¶75} Under subsection (d), permanency is unable to be achieved without permanent custody being granted to LCDJFS. V.P. is less than two years old; is completely dependent upon his caregivers to provide his basic needs; requires constant supervision to stay safe; and needs a stable and permanent home to keep him safe and consistently provide for all of his needs. There are no relatives who are willing, able, or appropriate to care for V.P., and an identified family will be able to ensure all his needs are being met.

{¶76} There have been continued concerns regarding Ms. Gore's and Mr. Pizzino's follow through with mental health services and their ability to provide basic needs for themselves and V.P. Ms. Gore's and Mr. Pizzino's income is unstable, and they rely heavily on Ms. Yount for housing and financial support. From May to December 2019, they were homeless and living in a tent. Mr. Pizzino has been working part-time. They are not able to support V.P. by providing him with food, shelter, clothing, or other

necessities. Their mental health remains a concern, especially due to Ms. Gore's inconsistency in mental health services throughout the entirety of the case.

{¶77} Under subsection (e), the trial court found that R.C. 2151.414(E)(11) was applicable. Neither Ms. Gore nor Mr. Pizzino have shown, notwithstanding the prior termination of their parental rights to V.P.'s sibling, that they are able to provide a legally secure placement for V.P. and that they have the ability to provide adequate care for V.P.'s health, welfare, and safety.

{¶78} Ms. Gore does not dispute the trial court's determination that R.C. 2151.414(B)(1)(d) was applicable, i.e., that V.P has been in the temporary custody of LCDJFS for 12 or more months of a consecutive 22-month period. Rather, Ms. Gore disputes the trial court's best-interest determination.

### Legally Secure Permanent Placement

{¶79} Ms. Gore challenges the trial court's best-interest findings under R.C. 2151.414(D)(1)(d) and R.C. 2141.414(E)(11).

{¶80} As indicated, R.C. 2151.414(D)(1)(d) requires the trial court to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2141.414(E)(11) requires the trial court to consider whether "[t]he parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section * * *, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child."

{¶81} Ms. Gore contends that she and Mr. Pizzino established these factors in their favor by demonstrating: (1) suitable housing; (2) financial support from community, family, and government programs; (3) consistent employment on Mr. Pizzino's part and consistent efforts to find the right position for her; (4) enrollment in and regular attendance at mental health and medication programs from which they have never been expelled; (5) experience with parenting education; and (6) placement that included "food, shelter, and a sufficient collection of baby supplies."

{¶82} Despite Ms. Gore's positive characterization, the record contains substantial competent and credible evidence supporting the trial court's findings under R.C. 2151.414(D)(1)(d) and R.C. 2141.414(E)(11).

{¶83} As the trial court noted, V.P. was less than two years old at the time of the permanent custody hearing and required a "stable and permanent" home to keep him safe and to "consistently" provide for all of his needs. The testimony and documentary evidence described above establishes that Ms. Gore and Mr. Pizzino have a long history of instability and inconsistency in housing, employment, and mental health treatment, which resulted in the prior termination of their parental rights to V.P.'s sibling and a grant of emergency and temporary custody of V.P. to LCDJFS shortly after his birth. While more recent improvements in Ms. Gore's and Mr. Pizzino's life circumstances are certainly worthy of acknowledgment and commendation, they do not reflect the stability required to establish a legally secure permanent placement for a young child such as V.P. or a long-term ability to adequately provide for his health, welfare, and safety.

{¶84} For instance, while she and Mr. Pizzino resided in Lake County, Ms. Gore exhibited significant symptoms of mental illness and was hospitalized on two separate

18

occasions for suicidal thoughts or behavior. Although Ms. Gore eventually reinstated mental health services in Xenia, she consistently missed scheduled appointments. Her recent medical records demonstrate continuing struggles with her significant mental health issues and resistance to following treatment recommendations. The fact that Ms. Gore has not been expelled from any mental health programs does not compel a contrary conclusion.

{¶85} Although Ms. Gore and Mr. Pizzino appeared to have suitable housing at the time of the hearing, it followed a substantial period of time in which they were homeless and living in a tent in Lake County. After moving to Xenia, the couple lived in a home with a registered sex offender for several months. In addition, the couple's housing inconsistency in Lake County was motivated, at least in part, by conflict with other individuals. After Ms. Gore and Mr. Pizzino moved into their current home, Ms. Yount's husband moved out due to conflicts with them, which reflects continuing discord.

{¶86} Ms. Gore has been consistently unemployed in Lake County and in Xenia. She was terminated from employment at several fast-food restaurants in Xenia for inappropriate or irresponsible behavior, including one instance in which she relapsed on heroin while on the premises. This evidence reflects the existence of more serious issues than a mere failure to find the "right position."

{¶87} Although Mr. Pizzino has been consistently employed in Lake County and in Xenia, his employment has consisted of part-time work at fast-food restaurants. Therefore, the couple relies on food stamps and on Ms. Yount to pay the rent for their current housing. At the time of the hearing, however, Ms. Yount had recently lost her job

and began working at McDonald's. The couple had to borrow funds from their pastor to make the trip to Lake County.

{¶88} Accordingly, despite noticeable improvements, the evidence supports a conclusion that material aspects of Ms. Gore's and Mr. Pizzino's life circumstances remained unstable.

{¶89} Ms. Gore also does not acknowledge the seriousness of her failure to successfully complete parenting skills education. According to Ms. Gore, she was "just a six-week online attendance certificate away from fully satisfying that case plan goal."

{¶90} While the parents' progress is measured in part by their completion of the case plan goals, the case plan is not the only measure by which a court determines whether to grant a motion for permanent custody. *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 103. The main issue considered by the courts is not whether the parent has substantially complied with the case plan, but, rather, whether the parent has substantially remedied the conditions that caused the child's removal. *Id.*

{¶91} Ms. Mendez and Ms. Suminguit both testified that they had serious concerns regarding Ms. Gore's and Mr. Pizzino's abilities to care for a young child. After moving to Xenia, the couple no longer participated in hands-on parenting education, which the testimony indicated they needed the most. In addition, the couple did not complete the online parenting class in Xenia because of Mr. Pizzino's failure to attend and Ms. Gore's angry outburst toward the service provider after being reminded of the attendance requirements.

{¶92} Ms. Gore further contends that the trial court's findings are incorrect based on its reliance on the GAL's recommendation. According to Ms. Gore, the GAL's

20

conclusion that she is not "currently able to provide appropriate and necessary care for [V.P.] and will not be in the reasonable future" is not accurate based on her circumstances at the time of the permanent custody hearing.

{¶93} As indicated, despite some noticeable improvement in Ms. Gore's and Mr. Pizzino's life circumstances by the time of the hearing, the evidence supports the GAL's conclusion. Accordingly, the trial court's reliance on the GAL's recommendation did not render its findings against the manifest weight of the evidence.

{¶94} Finally, Ms. Gore contends, in the alternative, that the couple established that they would be able to provide a legally secure permanent placement for V.P. and adequate care for his health, welfare, and safety "in a very reasonable amount of time."

{¶95} While we do not doubt the sincerity of Ms. Gore's belief, this court has repeatedly emphasized the need to provide permanence for children. *See In re J.L.S.*, 11th Dist. Portage Nos. 2020-P-0053 & 2020-P-0054, 2020-Ohio-5143, ¶ 33. Speculative future plans do not justify failure to terminate parental rights when it is in the children's best interest. *Id.* The trial court was not required to deny V.P. the permanency that he needs, especially at such a young age, in order to provide Ms. Gore and Mr. Pizzino additional time to prove that they can provide a legally secure permanent placement for him. *See In re N.S.N.*, 4th Dist. Washington Nos. 15CA6, et al., 2015-Ohio-2486, ¶ 50. The law also does not require the court to experiment with a child's best interest at the risk of great detriment or harm. *See id.*

{¶96} Accordingly, the trial court's best-interest findings under R.C. 2151.414(D)(1)(d) and R.C. 2141.414(E)(11) were not against the manifest weight of the evidence.

21

**Ms. Gore's Reply Brief**

{¶97} In her reply brief, Ms. Gore also challenges the trial court's best-interest findings under R.C. 2151.414(D)(1)(a) and (b). It is well-established that a party may not advance new arguments in its reply brief. *Am. Fiber Sys., Inc. v. Levin*, 125 Ohio St.3d 374, 2010-Ohio-1468, 928 N.E.2d 695, ¶ 21. Given the serious nature of these proceedings and the gravity of the outcome, however, we will consider Ms. Gore's additional arguments.

**The Child's Interaction/Interrelationship**

{¶98} R.C. 2151.414(D)(1)(a) requires the trial court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child."

{¶99} According to Ms. Gore, the trial court "surmised" that V.P. could not have formed any relationship with her via video chat due to his age and that he favored the bond with his foster parents. Ms. Gore contends that the trial court should have instead viewed the "strength" of V.P.'s bonds "in the context of his age" and "the resiliency toward change that accompanies it."

{¶100} The trial court's findings are supported by direct evidence from the hearing in the form of testimony from Ms. Suminguit and V.P.'s foster mother. By contrast, Ms. Gore's resiliency theory was not presented in any evidentiary form.

{¶101} Ms. Gore also contends that the testimony of Ms. Suminguit and V.P.'s foster mother was "conclusory" and "anecdotal" and thus not "competent or credible."

22

{¶102} The credibility of witnesses is primarily for the trier of fact. *In re D.H.*, 11th Dist. Ashtabula No. 2017-A-0081, 2018-Ohio-630, ¶ 18. According to the Supreme Court of Ohio, the trial court "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). "This is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Id.* at 419.

{¶103} The trial court appears to have determined that the uncontested testimony of Ms. Suminguit and V.P.'s foster mother was credible. Ms. Gore has not articulated the basis for her assertions and, thus, has not demonstrated how the trial court lost its way in its credibility determinations.

{¶104} Ms. Gore further contends that the trial improperly assigned more weight to the testimony of Ms. Suminguit and V.P.'s foster mother than to the fact that Ms. Gore had a "perfectly suitable living arrangement" for V.P.

{¶105} In addition to credibility, the weight to be given to the evidence is also primarily for the trier of fact. *In re D.H.* at ¶ 18. Further, the premise underlying Ms. Gore's contention is incorrect. As discussed above, the trial court did not find that Ms. Gore's "living arrangement" for V.P. was "perfectly suitable."

{¶106} Accordingly, the trial court's best-interest finding under R.C. 2151.414(D)(1)(a) was not against the manifest weight of the evidence.

**The Child's Wishes**

{¶107} Finally, Ms. Gore challenges the trial court's best-interest finding under R.C. 2151.414(D)(1)(b), which requires the trial court to consider "[t]he wishes of the child, as

23

expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child."

{¶108} Ms. Gore acknowledges that V.P.'s young age prevented him from comprehending the proceedings or expressing his wishes. Nonetheless, Ms. Gore contends that the trial court should not have considered the GAL's recommendation under this factor because her report was not admitted as an exhibit at the hearing. In support, Ms. Gore cites Sup.R. 48.06(C)(2), a Rule of Superintendence for the Courts of Ohio, which provides that "[t]he court shall consider the recommendation of the guardian ad litem in determining the best interest of the child only when the report or a portion of the report has been admitted as exhibit."

{¶109} Sup.R. 48.06 was not adopted until January 1, 2021, which was subsequent to the permanent custody hearing in this case held in November 2020.

{¶110} Further, Ms. Gore quotes the rule out of its proper context. Sup.R. 48.06(C) expressly applies to GAL reports in "proceedings involving *the allocation of* parental rights and responsibilities, custody, and visitation." (Emphasis added.) Sup.R. 48.06(C)(1). By contrast, Sup.R. 48.06(B) applies to GAL reports in "abuse, neglect, dependency, unruly, and delinquency cases and *actions to terminate parental rights*," and it does not contain this requirement. (Emphasis added.) Sup.R. 48.06(B)(1).

{¶111} Former Sup.R. 48(F)(2), which was in effect at the time of the hearing, contained the same requirement as Sup.R. 48.06(C)(2). However, Sup.R. 48(F)(2) expressly applied to "domestic relations proceedings involving *the allocation of parental rights and responsibilities*." (Emphasis added.) *Id.* By contrast, Sup.R. 48(F)(1) applied

to GAL reports in "juvenile abuse, neglect, and dependency cases and *actions to terminate parental rights*," and it did not contain this requirement. (Emphasis added.)

{¶112} Accordingly, the trial court was permitted to consider the GAL's report in support of its best-interest finding under R.C. 2151.414(D)(1)(b).

{¶113} In sum, our review of the record demonstrates that the trial court considered all required statutory factors and that substantial competent, credible evidence supports its best-interest findings. Therefore, the trial court's best-interest determination was not against the manifest weight of the manifest.

{¶114} Ms. Gore's sole assignment of error is without merit.

{¶115} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas, Juvenile Division, granting permanent custody of V.P. to LCDJFS is affirmed.


CYNTHIA WESTCOTT RICE, J,

MATT LYNCH, J.,

concur.

25