[Cite as *In re W.W.*, 2021-Ohio-3440.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

IN RE: W.W.,

A DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 CO 0011**

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division of Columbiana County, Ohio
Case No. J2018-0062-4

**BEFORE:**
Carol Ann Robb, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Rhonda G. Santha*, 6401 State Route 534, West Farmington, Ohio 44491, for Appellant and

*Atty. Vivo Abruzzino, Columbiana County Prosecutor, Allyson Lehere, Assistant Prosecuting Attorney*, 105 South Market Street, Lisbon, Ohio 44432 for Appellee.

Dated: September 20, 2021

**Robb, J.**

{¶1} Appellant-mother, S.H., appeals the decision of the Columbiana County Common Pleas Court, Juvenile Division, terminating her parental rights and granting custody of her minor son, W.W., to the Appellee Columbiana County Department of Jobs and Family Services (CCDJFS or agency). Appellant asserts CCDJFS did not make reasonable efforts to reunify her with W.W. and thus, the juvenile court's decision should be reversed. As discussed below, the record does not support Appellant's position; the record indicates the agency made reasonable efforts. The record supports the juvenile court's determination that it is in the best interest of W.W. for Appellant's parental rights to be terminated and for permanent custody to granted to the agency. The juvenile court's decision is affirmed.

Statement of the Case

{¶2} W.W., born June 1, 2018 at East Liverpool Hospital, is the biological child of Appellant and E.W. (father). Appellant informed hospital personnel she did not know she was pregnant until she went into labor; Appellant indicated she received no prenatal care and even if she had known she was pregnant she would not have gotten prenatal case because she had no health insurance. Appellant and E.W. were homeless when the child was born.

{¶3} On June 4, 2018, CCDJFS filed a complaint alleging W.W. to be a dependent child. That same day, the magistrate granted the emergency motion and placed W.W. in the temporary custody of CCDJFS. 6/4/18 Magistrate's Order. The probable cause hearing was held the following day and included a shelter care hearing; Appellant and E.W. were present at the hearing. The magistrate found probable cause for the emergency ex parte order and found shelter care was necessary and continued to be necessary. In making this order, in addition to noting Appellant was unaware she was pregnant, the magistrate explained Appellant has an extensive history with CCDJFS. Appellant has four other children who have been subject to court involvement and who are not currently in Appellant's legal custody. The magistrate also explained E.W. has history with the court. One of his children was removed from his and the child's mother's custody. The child was reunited with the child's mom, but E.W. failed to complete his

portion of the case plan. 6/8/18 Magistrate Order. Based on the above information and determination, the matter was set for an adjudicatory hearing.

{¶4} Prior to the adjudicatory hearing, CCDJFS filed a report recommending W.W. remain in its temporary custody. This report included the prior information regarding Appellant not knowing she was pregnant. In the report it was further explained that Appellant has been diagnosed as being "mildly mentally retarded." The report also indicated, in addition to E.W. failing in a case plan with one of his children, he also voluntarily gave up custody of another son to a maternal aunt in 2011 without explanation. 7/12/18 Report.

{¶5} Following the July 19, 2018 adjudicatory hearing, the magistrate held that each parent demonstrated an inability to provide proper parental care to the child and was unable to safely care for the child. In order for reunification to occur, it held they needed to complete a case plan, which would include maintaining a safe and stable home. They were granted weekly supervised visitation. 8/1/18 Magistrate's Decision.

{¶6} The dispositional hearing occurred that same day. 8/1/18 J.E. The juvenile court determined placement with CCDJFS was in the child's best interest and set a review hearing for January 10, 2019. 8/1/18 J.E.; 12/21/18 J.E. Nunc Pro Tunc of 8/1/18 J.E. The court adopted the July 9, 2018 case plan and attached it to the decision. This case plan identified three areas of concern. The first concern was neither parent has custody of their other children. Thus, the plan required the parents to complete parenting classes at Project Safe. The second concern was W.W. is too young to protect himself and provide for his own basic needs. The plan required the parents to attend W.W.'s medical appointments and visitation. The third concern was Appellant and E.W.'s living conditions. They were reported to be homeless when W.W. was born. The case plan required them to provide safe and stable housing, to keep their caseworker up to date on their address, and to keep a clean house/apartment with the rent being current. 7/9/18 Case Plan.

{¶7} Prior to the January 10, 2019 review hearing, CCDJFS filed a report. 1/4/19 Report. This report recommended W.W. remain in the temporary custody of CCDJFS. The report specifically included a statement regarding Appellant's intellect and how she would benefit from counseling:

Although mental health has not been addressed as a concern on this plan directly, due to the psychological evaluation that [Appellant] completed in 2014, worker has recommended that [Appellant] complete an assessment to see if she could benefit from counseling now (previous evaluation stated that she would not). Worker has observed that [Appellant] lacks confidence in parental decisions. Worker would like to see [Appellant] gain some confidence and worker feels that she could benefit from speaking with a therapist. [Appellant] agreed to call and set it up. [E.W.] stated that he would also complete one. [Appellant] and [E.W.] both have stated that they will do whatever they need to be reunified with [W.W.]. Worker would ask that this be added to the case plan.

1/4/19 Report.

{¶8} In this report the caseworker updated the juvenile court on the progress of three concerns in the case plan. As to the first concern, parenting, the caseworker explained the parents did not start the parenting classes until mid-August and they had missed a couple classes that they would have to make up. There were some behavioral issues with E.W. during these classes. The instructors also indicated to the caseworker that they did not think the parents understood the material. Although they were near to completing the classes, the instructors had concerns about the parents' ability to care for W.W. As to the second concern, W.W. being too young to care for himself, the caseworker noted that there are weekly visits with the child and Appellant and E.W. for one hour. Concern number three was housing. The caseworker stated they have provided updated information and have lived in two different homes that were decent. 1/4/19 CCDJFS Report.

{¶9} Following the review hearing, the juvenile court ordered W.W. to remain in the temporary custody of the CCDJFS and indicated this was in the child's best interest. It ordered the case plan to be amended to include psychological evaluations for both parents and an updated case plan be filed. A review hearing date was set for July 18, 2019. 1/18/19 J.E.

{¶10} The amended case plan was filed in June 2019 and set forth the three prior concerns and added "lower functioning" as a fourth concern. 6/5/19 Case Plan; 6/10/19

Case No. 21 CO 0011

J.E. (adopting amended case plan). This concern required each parent to have a psychological evaluation at the Counseling Center or another approved licensed facility and to follow any and all recommendations of the professionals, which could include individual therapy, group counseling, etc. 6/5/19 Case Plan.

{¶11} Prior to the July 18, 2019 review hearing, two reports were filed. One was an administrative review and one was the caseworker's report. 6/26/19 Administrative Review; 7/12/19 Agency Report. Both recommended W.W. remain in the temporary custody of CCDJFS. As to the parenting, the first concern, the reports indicated although the parenting classes were completed, there remains concerns on the parents' ability to understand the material and parent. The reports indicated that E.W. takes the lead and Appellant follows under his direction. As to housing and visitation, the second and third concerns, the reports indicated the parents have been attending weekly visits (the number attended/missed is not listed in the report) and they have had two different residences and are moving again. As to the psychological evaluations, the fourth concern, the reports noted the evaluations were recently scheduled for the end of July.

{¶12} Based on the information presented at the review hearing, the juvenile court ordered W.W. to remain in the temporary custody of CCDJFS. 8/1/19 J.E. The next review hearing was set for January 16, 2020.

{¶13} On January 3, 2020 CCDJFS filed a report and once again recommended W.W. remain in its temporary custody. 1/3/20 Report. This report added new information regarding visits, which was an element of the second concern. Appellant and E.W. missed more than half of the visits since the beginning of 2019, and since September 2019 they had only attended 4 visits. When they miss visits, they often do not call to cancel. When asked about the missed visits, Appellant did not respond and E.W. stated car trouble. As to home conditions, the report noted that while in the beginning they kept their living conditions clean, the conditions had gradually gone downhill. They have also moved multiple times, but kept the caseworker fairly up to date on the addresses of new residences. Lastly, as to psychological evaluations, results of Appellant's evaluation were she is "intellectually handicapped and variably dependent on others" and she "seems presently ill prepared to maintain a stable environment or to singularly care for her child." The evaluation did not have recommendations for follow through. 1/3/20 Report.

**{¶14}** CCDJFS then filed a Motion for Permanent Custody indicating Appellant has not completed her case plan and she does not have custody of her four other children. 1/9/20 Motion for Permanent Custody. The matter was set for a hearing to occur on March 24, 2020. It does not appear the January 2020 review hearing was held.

**{¶15}** In early March, another report was filed by CCDJFS. In this report as to parenting, it was added, "[E.W.] and [Appellant] continue to visit with [W.W.] sporadically. [E.W.] and [Appellant] are not able to demonstrate the skills they were taught in Project SAFE in caring for [W.W.]. The agency believes that [W.W.] returning to the home of his biological parents would put him at risk for abuse and neglect due to [E.W.'s] and [Appellant's] poor understanding of basic childhood development and [W.W.'s] needs." 3/18/20 Report. As to visits, the report elaborated:

> Since September 2019, [Appellant] and [E.W.] have only shown for 8 visits, despite being on the visitation schedule for weekly visits. [E.W.] and [Appellant] went six weeks without visiting with [W.W.] between September and October 2019 (9/19/2019 – 10/31/2019.) [E.W.] and [Appellant] then went another seven weeks without visiting with [W.W.] between December 2019 and February 2020 (12/26/2019 – 02/06/2020.). Many of the times where [Appellant] and [E.W.] missed their visits, [E.W.] and [Appellant] would call to confirm their visit and then not show up to the visit. When [E.W.] and [Appellant] were asked about their missed visits, [Appellant] does not have an answer and [E.W.] reports sickness, car problems, or that they do not have enough gas, although caseworker Schondelmayer has provided [E.W.] with gas vouchers.

3/18/20 Report.

**{¶16}** The report indicated the caseworker did get to observe Appellant's and E.W.'s new residence. This residence did not contain any furniture, clothes, or toys for W.W. 3/18/20 Report.

**{¶17}** The pretrial hearing was held on March 24, 2020 via telephone and the matter was set for an August 17, 2020 merit hearing. 4/1/20 J.E.

**{¶18}** In early July, CCDJFS filed another report and asked for a reasonable efforts finding. On July 23, 2020, the juvenile court made a finding that CCDJFS has and

continues to make reasonable efforts at reunification. However, despite reasonable efforts by CCDJFS, it was not in the best interest of the child to be reunified with the parents and therefore, W.W. was to remain in the temporary custody of the agency. 7/23/20 J.E.

{¶19} The day before that judgment entry was filed, CCDJFS filed a motion to dismiss its prior motion for permanent custody. 7/22/20 Motion. The court granted the motion. 8/3/20 J.E. On the same day that motion was granted, CCDJFS filed another motion for permanent custody. 8/3/20 Motion. A hearing was scheduled for August 17, 2020. 8/10/20 J.E.

{¶20} CCDJFS filed reports in October and December 2020. 10/6/20 Report; 12/3/20 Report. These reports indicated the agency was seeking termination of parental rights. The issues regarding homelessness, visitation, and proper parenting were ongoing and not corrected. The matter was set for a hearing. 1/22/21 J.E.

{¶21} In its March 2021 report, CCDJFS stated W.W. had been in the custody of the department for 33 consecutive months since the child was 3 days old. 3/16/21 Motion. This comprehensive report explained W.W.'s birth, the parents' homelessness, Appellant did not have custody of her four other children, and E.W. did not have custody of two of his children (CCDJFS indicated he has 6 children, while E.W. claims to have 12 children). The report included statistics for their attendance for visits with W.W. In 2018, they attended 86% of the scheduled visits. In 2019, 48% of the scheduled visits. In 2020, 40% of the scheduled visits. In 2021, they attended 6 of the 10 visits. As to Appellant being lower functioning, the caseworker informed Appellant and E.W. in November 2020 they needed to enter counseling. Appellant eventually completed her intake appointment in December 2020, but she failed to return, participate in or reach out to schedule an appointment.

{¶22} The permanent custody hearing was held on March 30, 2021. The testimony included information regarding the listed concerns in the case plan. Testimony also updated the report and Appellant's housing was discussed. The testimony established Appellant and E.W.'s current residence was unable to be inspected due to their evasiveness and failing to inform the caseworker they were moving.

**{¶23}** The juvenile court issued a 14-page decision terminating the parental rights of both Appellant and E.W. Appellant timely appealed the decision. 5/11/21 Notice of Appeal.[1] This is an expedited appeal.

<u>Assignment of Error</u>

"Appellee failed in its reasonable efforts to reunify/unify Appellant with [W.W.], in contravention of the Ohio child welfare statutes."

**{¶24}** Appellant contends the sole issue in this case is Appellant's "intellectual disabilities." She contends the juvenile court based its decision to terminate her parental rights on her "intellectual disabilities" and there were no reasonable efforts on the part of the agency to teach her how to parent based on her limited cognitive abilities. She admits she did not move to set aside the prior findings of reasonable efforts and thus, her argument must be viewed under a plain error standard of review.

**{¶25}** CCDJFS agrees that the issue is reviewed under a plain error analysis. CCDJFS disagrees with Appellant's assessment that there were not reasonable efforts by the agency and that the sole basis for termination was Appellant's intellectual disabilities. It contends the termination decision was based on lack of parenting knowledge, housing instability, and intellectual deficiencies.

**{¶26}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972). A parent's interest in the care, custody, and management of his or her child is "fundamental." *Id.*; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith,* 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

**{¶27}** "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24. The Ohio Supreme Court has explained, "clear and convincing evidence" is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or

---

[1]It does not appear E.W. appealed the decision. If he did file an appeal, it is not part of this record.

<u>Case No. 21 CO 0011</u>

conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

{¶28} It is undisputed W.W. was in the custody of the agency for 33 consecutive months at the time the motion for permanent custody was filed. Both parties acknowledge the juvenile court made the reasonable efforts findings prior to the permanent custody hearing and at the permanent custody hearing. Appellant raises no other procedural and/or substantive issue with the proceedings or the juvenile court's other determinations. Appellant's argument focuses on the lack of reasonable efforts to help her overcome her "intellectual deficiencies" so she could be reunified with W.W.

{¶29} The juvenile court did base part of its decision to terminate Appellant's parental rights on her "low intellectual functioning." 5/4/21 J.E. This reasoning focused on Appellant's ability to obtain "skills necessary for the care and protection of the minor child." 5/4/21 J.E. The juvenile court noted the psychological evaluation of Appellant found she was "unable to independently parent and individual counseling was recommended. The child's mother was unwilling to enter into individual counseling and has failed to address this concern of the Case Plan." 5/4/21 J.E. She asserts the agency should have made further reasonable efforts, more than just counseling, to address her "low intellectual functioning" and to help her understand how to parent given her intellect.

{¶30} It has been explained:

R.C. 2151.413(D)(3)(b) expressly prohibits the agency from moving for permanent custody on the basis that a child has been in the agency's temporary custody for 12 of 22 months if, when required to do so, the agency "has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home." Accordingly, inherent in an agency's "12 of 22" allegation is that it has engaged in reasonable efforts towards reunification. Unless the agency has been relieved of its statutory obligation to use reasonable efforts to facilitate reunification, it must demonstrate such efforts at the permanent custody hearing, if it has not established that it made reasonable efforts

prior to the hearing on the motion. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43.

*In re H.S.*, 9th Dist. Summit No. 29401, 2019-Ohio-4334, ¶ 17.

**{¶31}** Here, the agency does not claim that it was statutorily relieved of its obligation to make reasonable efforts. Rather, it claims it made reasonable efforts.

**{¶32}** Many of our sister districts have found "reasonable efforts" to mean, "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]' " *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). The agency must act diligently and provide services appropriate to the family's needs. *In re H.M.K.,* 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95; *In re D.A.,* 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. A "reasonable effort" is an effort that is honest, purposeful, and free of malice. *In re D.R.*, 6th Dist. Lucas No. L-17-1240, 2018-Ohio-522, ¶ 46. The issue in a reasonable efforts determination is not whether the agency could have done more or if it did everything possible, but whether it used reasonable efforts. *In re T.S.*, 6th Dist. Lucas No. L-19-1247, 2020-Ohio-2972, ¶ 98; *In re D.R.,* 2018-Ohio-522 at ¶ 46; *In re Lopez*, 166 Ohio App.3d 688, 2006-Ohio-2251, 852 N.E.2d 1266, ¶ 54 (3d Dist.).

**{¶33}** Here, the reports from the caseworkers and the testimony at the permanent custody hearing established Appellant was provided a great deal of encouragement from the caseworkers (4-6 caseworkers worked on this case) not only throughout this case, but also in the case involving her other 4 children. Included in this case plan was a parenting class. The reports indicate the instructors attempted to explain things multiple times to Appellant. The case plan also added a psychological evaluation and then individual counseling.

**{¶34}** Appellant indicates "intellectual disabilities" were not mentioned until the January 2019 case plan and not mentioned by the juvenile court until the July 23, 2020 judgment entry. While these statements are technically true, they must be viewed in the context of the entire case. The child was born June 1, 2018. The first case plan was adopted by the trial court in July 2018. That case plan did not state Appellant's

"intellectual disabilities" were a concern. In July 2018, the juvenile court set the matter for a review hearing in January 2019. Prior to that review hearing, CCDJFS filed a report on Appellant's progress with the case plan. This report included a specific statement concerning Appellant's "intellectual deficiencies" and asked for a psychological evaluation of Appellant and that she would benefit from counseling. The language used by the caseworker indicated she discussed this with Appellant prior to the date of the report. 1/4/19 Report. The trial court ordered this concern and a psychological evaluation to be added to the case plan, which it was, and the trial court adopted the new plan in June 2019. 1/18/19 J.E. (ordering addition to case plan); 6/5/19 Case Plan (adding "intellectual deficiency" concern); 6/10/19 J.E. (adopting amended case plan). Although Appellant insinuates this "intellectual disabilities" concern was not added until later in the case, she is incorrect. The concern was brought to her attention and the court's attention early in the case (within 6 months of the start of the case).

{¶35} The record indicates that after the psychological evaluation was added to the case plan, Appellant was slow to complete it despite encouragement from her caseworker. Counseling was added later in the case plan. Appellant did contact the counseling center in December 2020 (four months prior to the permanent custody hearing) after further encouragement from her caseworker, but failed to follow through on setting up an appointment. This failure to follow through has been a consistent behavior for Appellant (as is shown below in the discussion of notifying the agency of moving residences and in consistently visiting W.W.).

{¶36} Appellant contends this case is akin to *In re H.S.*, a Ninth Appellate District Court case where the appellate court found the agency did not make reasonable efforts. A "hands-on parenting education program" was part of the case plan in *In re H.S. In re H.S.*, 9th Dist. Summit No. 29401, 2019-Ohio-4334, at ¶ 18-19. The first time the appellate court reviewed the case, it found the agency did not make any effort to reschedule the parenting class when there was a conflict. *Id.* at ¶ 18-19. Upon remand, the instructor was able to give hands-on instruction at two in-home visits, but the agency then cancelled the in-home visits for the policy reason that the agency indicated there was no more time to reunify. *Id.* at ¶ 20. The instructor continued to work with the parents alone, but due to scheduling reasons could not attend the visits at the agency's facility. *Id.* Still, the agency proceeded to seek permanent custody of the children. At the

permanent custody hearing, the caseworker testified during the in-home visits both parents showed improvement from working with the instructor. *Id.* at ¶ 21. The caseworker added she believed the parents' progress would have continued with more in-home visits and training, and she regretted in-home visits had to cease based merely on agency policy; the caseworker noted the parents had done nothing wrong during in-home visits to otherwise require termination. *Id.* The agency in *In re H.S.* proceeded with termination under its policy that there was no more time for reunification. *Id.* at ¶ 18-23. The appellate court reversed based on the artificial deadline set by the agency for reunification and concluded:

> Based on the evidence presented at the permanent custody hearing, this is not a hopeless case where the parents have demonstrated no ability to assimilate the knowledge and skills necessary to safely parent the children. Both the CSB caseworker and Ohio Guidestone instructor testified that the parents were making progress and demonstrating an improved ability to identify potential issues and engage in problem-solving. The opportunity for the juvenile court to determine whether or not the parents can ultimately progress to the point of being able to provide a safe and stable home environment for the children has not yet been presented based on the lack of reasonable reunification efforts by CSB.

*Id.* at ¶ 24.

{¶37} We disagree that the case at hand is similar to *In re H.S.* There was no hands-on parenting class ordered in this case, but there was a parenting class (Project SAFE) that was ordered and completed. Unlike in *In re H.S.* where the instructors believed the parents were making strides, here the instructors noted that despite repeated efforts to help explain the material, it did not seem Appellant understood. The record here also indicates the caseworkers provided instruction to Appellant during the visits at the agency's facility. Appellant was advised to bring toys and age-appropriate food for W.W. She followed the instruction and corrections about what selection of food to bring and to pace W.W. in eating so the child would not get sick. However, in one of the reports, the caseworker indicated Appellant was not able to demonstrate the skills she was taught in

Project SAFE (parenting class). This is in direct contrast to what the caseworker in *In re H.S.* indicated.

**{¶38}** As stated above, a psychological evaluation was ordered and Appellant was slow to complete it despite encouragement from her caseworker. Counseling was added a little later to the case plan, but as of the date of the permanent hearing Appellant failed to schedule an appointment despite having four months to do so. Appellant's actions demonstrate a failure to follow through, while the parents in *In re H.S.* did follow through.

**{¶39}** The last caseworker on Appellant's case testified she was proactive in motivating Appellant because she understands what constitutes reasonable efforts. 3/30/21 Permanent Custody Hearing Tr. 54. She also indicated she has worked with Appellant in the past and knows she needs prompting and reminding. 3/30/21 Permanent Custody Hearing Tr. 54. The other caseworkers' reports also indicated regular prompting and reminding of actions necessary to successfully complete the case plan.

**{¶40}** The last caseworker's involvement is additionally enlightening because this caseworker was Appellant's caseworker in the case with her other four children. She was aware of Appellant's cognitive disadvantages. 3/30/21 Permanent Custody Hearing Tr. 87. She explained Appellant in that prior case plan made huge strides due to the phenomenal support she received from services, but then Appellant stopped all those services. 3/30/21 Permanent Custody Hearing Tr. 87. The caseworker explained once the services were stopped, Appellant regressed and deteriorated. 3/30/21 Permanent Custody Hearing Tr. 88. Before the regression, she was able to get custody of one of her other children for a short while, but lost custody when she regressed. 3/30/21 Permanent Custody Hearing Tr. 89.

**{¶41}** This scenario is different from *In re H.S.* where the caseworker indicated with more time reunification would be possible. Here, the caseworkers made no indication that if more was offered or more time was given then reunification would be possible.

**{¶42}** Could more have been added by the caseworker(s) and the juvenile court to the case plan? Possibly, yes, a second parenting class directed more to her cognitive abilities could have been required. However, the record demonstrates she was slow to complete the parenting class, did not start counseling sessions, failed to timely advise the agency on her address when she moved, and was infrequent in attending visitation with

Case No. 21 CO 0011

W.W. (last two discussed in depth below). These actions suggest she would have been slow to attend another required parenting class. Furthermore, as the above law clearly provides, the question is not whether the agency could have done more or if it did everything possible. The question is whether the efforts it made were reasonable (honest, purposeful, and free from malice). Considering the entire record, including all the reports and the last caseworker's experiences with Appellant, the answer is yes, reasonable efforts were made.

**{¶43}** Regardless, even if we are incorrect in that determination, as the agency points out, the juvenile court decision to terminate parental rights (that it was in the best interest of W.W. for the agency to obtain permanent custody) was not based solely on "intellectual deficiencies." The juvenile court's decision is 14 pages in length and is based on Appellant's living conditions, the fact that her other 4 children are not in her legal custody, the lack of consistent visitation with W.W., and her "intellectual deficiencies" that hinder her ability to parent safely.

**{¶44}** As to Appellant's relationships with her other children, the court stated:

It is undisputed that both parents have had prior court involvement regarding allegations of abuse or neglect of their children in their households. The child's mother has four other children that have been placed outside of her legal custody. * * *

* * *

The child's mother in this case has four other children, [E.H., B.W., R.W., and L.H.]. All four of those children have been adjudicated as dependent children in hearings before this Court. In each case, the child's mother failed to demonstrate her ability to parent primarily based upon her intellectual disabilities. The child's mother therefore did not successfully complete the Case Plan and [E.H., B.W., R.W., and L.H] were all ultimately placed by this Court into the legal custody of the children's maternal grandparents.

5/4/21 J.E.

Case No. 21 CO 0011

**{¶45}** Testimony from the caseworker at the permanent custody hearing discussed Appellant's lack of legal custody of her four other children. 3/30/21 Permanent Custody Hearing Tr. 16-17, 24-25, 27-31 (discussing of circumstances surrounding the other four children).

**{¶46}** Housing was also a concern for the caseworkers and the juvenile court. As noted by the court and caseworkers, Appellant was reportedly homeless when she gave birth to W.W. The case plan focused on Appellant maintaining stable housing and informing the caseworkers of her current address. In the beginning of the case, Appellant and E.W. complied with these terms and had stable housing until October 2020 despite having moved at least four times. However, after October 2020, Appellant and E.W. were evasive about their residence. The court explained:

> Unfortunately, as of the date of hearing on Permanent Custody, the child's parents had moved from the Wellsville, Ohio residence and their reported new housing in East Liverpool, Ohio had not been inspected to determine whether it was appropriate. The reasons for the lack of inspection of the parents' most recent residence is based upon their failure to timely report to the Children's Services Agency that they had moved from the Wellsville residence on or about February 1st, 2021 and the parents not making themselves and their residence available for inspection when the new residence was discovered by the Children's Services Agency. The Children's Services Agency during the month of February 2021 made significant efforts to contact the child's parents and to inspect their home. During the month of February it is clear to the Court from the evidence that the child's father actively concealed the location of his residence and the fact that he had vacated the Wellsville residence. No specific description of the appropriateness of the new residence is available for the Court's consideration with the exception that the parents claim that they have maintained their furnishings which they had previously had when they resided in Wellsville, Ohio. The Court is frustrated in its inability to determine whether the child's parents have attained the goals of this third concern of the Case Plan. The child's parents have failed to keep the

Children's Services Agency advised of their residence and to demonstrate their compliance.

* * *

The Court also finds that the child's parents have failed continuously and repeatedly to remedy their housing instability as identified as concern number three under the Case Plan. The Children's Services Agency has demonstrated reasonable efforts through case planning and diligent efforts through referral of the child's parents to community resources to remedy their homelessness or unstable housing that existed prior to the removal of the child. While the parents had demonstrated significant progress in the quality of their housing, they have failed to demonstrate stability in their housing. As the Court has noted, they have had at least five different residences during the three year pendency of this case and the child's parents have failed to verify moving to their most recent residence and evaded inspection of that residence so that the Court could determine whether their current residence is safe and appropriate.

5/4/21 J.E.

**{¶47}** These findings were supported by the testimony of the current caseworker at the permanent custody hearing. 3/30/21 Permanent Custody Hearing Tr. 36, 40-49 (testimony concerning attempts to view current residence).

**{¶48}** The lack of consistent visitation was also a concern for the juvenile court. The court stated:

During the course of this case, the Case Plan has provided for and the Court has ordered opportunity for both of the child's parents to have companionship with the minor child. Companionship was scheduled one time per week, supervised by the Children's Services Agency. Only approximately one-half of the visits scheduled during this case has been attended by the parents. At times, the parents are reported to have interacted well with the minor child. At other times, the child's father was

Case No. 21 CO 0011

found to be somewhat inattentive, preferring to talk with the supervisor or distracted by his telephone. The child's parents required occasional redirection and instruction in regard to appropriate snacks and portion size for the child. Due to the parents' inconsistent exercise of companionship with the child, the child has as of the date of the hearing failed to identify his parents as "mom and dad". At one point, the child's mother began to work outside of the home and her work interfered with her scheduled visits. She did not immediately contact the Children's Services Agency to reschedule the visits. The child's mother missed visits for nearly two months. Although the child's father did not have an employment conflict with visitation, he also did not visit during the period that the child's mother's employment conflicted with the scheduled visits.

5/4/21 J.E.

**{¶49}** At the permanent custody hearing, testimony established the number of visits scheduled for each year and the number attended along with any circumstances that warranted cancelation. In 2018, there were 30 visits scheduled, but W.W. was sick for 1 of the visits and it was cancelled for that reason. 3/30/21 Permanent Custody Hearing Tr. 69. Therefore, there were 29 possible visits. Appellant attended 26 of those visits. 3/30/21 Permanent Custody Hearing Tr. 69-70. In 2019, there were 52 visits scheduled, but W.W. was sick 5 times, so the possible visits for Appellant to attend was 47. 3/30/21 Permanent Custody Hearing Tr. 70-71. Appellant attended 25 of those 47 scheduled visits. 3/30/21 Permanent Custody Hearing Tr. 71. In 2020, due to the pandemic, there were only 40 possible visits and W.W. was sick for 3 of those visits, but 1 was able to be made up. 3/30/21 Permanent Custody Hearing Tr. 73. Therefore, Appellant had 38 opportunities to visit W.W. 3/30/21 Permanent Custody Hearing Tr. 73. However, she only took advantage of 16 opportunities. 3/30/21 Permanent Custody Hearing Tr. 73-74. In 2021 (as of the date of the hearing), there were 12 scheduled visits, but W.W. was sick for 1, so there were 11 opportunities to visit. 3/30/21 Permanent Custody Hearing Tr. 79. She only took advantage of 7 of those opportunities and only attended 1 visit in March before the March 30th hearing. 3/30/21 Permanent Custody Hearing Tr. 79. In sum, in the first year of W.W.'s life Appellant attended 90% of the visits,

the second year she attended 53% of the visits, and the third year, she attended below 50% of the visits. 3/30/21 Permanent Custody Hearing Tr. 71, 80.

**{¶50}** When asked if these statistics indicated a commitment to care for the child, the caseworker indicated no, but added it was apparent from talking with Appellant that she loves the child. 3/30/21 Permanent Custody Hearing Tr. 80. The caseworker testified that there were significant blocks of time Appellant did not attend visitation. 3/30/21 Permanent Custody Hearing Tr. 75. The caseworker explained the sporadic visitation is problematic because W.W. does not get an opportunity to know Appellant is his mom and when more and more time passes between visits because Appellant fails to appear, it is difficult to create a lasting bond. 3/30/21 Permanent Custody Hearing Tr. 72. This is especially the case given W.W.'s age. He was removed from Appellant's custody when he was days old and for his entire life (approximately 3 years, which are formative years) he has never been in her custody.

**{¶51}** Two of the reasons offered by Appellant for missing visitation was due to a lack of gas money and her work schedule. As to gas, the record indicated Appellant was offered a gas card, which she used. The gas card comes with requirements to turn in receipts. 3/30/21 Permanent Custody Hearing Tr. 132. Appellant failed to turn in receipts and the gas card was suspended. 3/30/21 Permanent Custody Hearing Tr. 132. Appellant's own testimony admitted she knew receipts had to be turned in and she does not remember if she ever turned in the receipts. 3/30/21 Permanent Custody Hearing Tr. 157.

**{¶52}** The second reason for missing visitation was it interfered with her work schedule. While needing to reschedule visitation due to work is understandable, the problem in this case was Appellant failed to inform the caseworker of her work schedule until she missed numerous visits. 3/30/21 Permanent Custody Hearing Tr. 75. Once the caseworker was informed of the conflict, the visits were immediately changed to a day and time Appellant could attend. 3/30/21 Permanent Custody Hearing Tr. 76.

**{¶53}** Both of the above are examples of Appellant's lack of taking the initiative and informing the agency of what was happening (similar to moving residences). The reports of the caseworkers contain numerous references to Appellant being a follower, not taking initiative, and needing to be directed. The reports indicate there needs to be someone there to help direct her and there does not appear to be anyone meeting those

qualifications in her life. If E.W. is the one she is relying on, he does not always follow through and/or does not show that he understands how to parent a child. Furthermore, it does not appear he appealed the termination order. Appellant's failure to take initiative is problematic when considering the care of a young child is involved.

{¶54} Admittedly, the record indicates Appellant did make some progress on her case plan in the areas of housing and completion of the parenting class. It has been explained that while evidence of progress or completion of a case plan is relevant to a best-interest determination, it is not dispositive of it. *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 55. Satisfying a goal of a case plan does not equate to a finding that the parent has the ability to assume custody of the child. *In the Matter of N.M.*, 10th Dist. Franklin No. 20AP-158, 2021-Ohio-2080, ¶ 54. Despite the completion of the parenting class, Appellant failed to demonstrate effective parenting skills and showed a reluctance to participate in individual counseling which might have helped in that area. In fact, as of the date of the permanent custody hearing, she had not scheduled an individual counseling session despite having three months to do so. As to housing, she admittedly made strides, but regressed in this area and failed to keep the agency advised on her move so that her housing could be inspected. The house she was currently living in on the date of the permanent custody hearing was not inspected because the agency did not know where she was living. These issues indicate despite some completion of the plan, Appellant does not have the ability to assume custody of W.W. *See id.* at ¶ 53 (Although the psychological evaluation was completed, parents refused to meet with counselor until right before hearing. As to housing, the current house was cleaner than previous locations, but would only let caseworker see certain parts of the house.); *In the Matter of V.J.P.*, 11th Dist. Lake No. 2020-L-124, 2021-Ohio-1779, ¶ 83-84 ("The testimony and documentary evidence described above establishes that the couple has a long history of instability and inconsistency in housing, employment, and mental health treatment, which resulted in the prior termination of their parental rights to V.P.'s sibling and a grant of emergency and temporary custody of V.P. to LCDJFS shortly after his birth. While more recent improvements in Mr. Pizzino's and Ms. Gore's life circumstances are certainly worthy of acknowledgment and commendation, they do not reflect the stability required to establish a legally secure permanent placement for a young child such as V.P. or a long-term ability to adequately provide for his health, welfare, and safety."); *In the Matter*

Case No. 21 CO 0011

*of R.G.S.,* 10th Dist. Franklin No. 20AP-101, 2020-Ohio-6696, ¶ 68 ("Finally, it is important to note the juvenile court acknowledged the recent progress both A.D. and R.S. had made on their case plans. Specifically, the court noted A.D.'s 'recent efforts to resolve the issues which [led] to her children's removal, [including] significant substance abuse issues, homelessness, unemployment and instability' and that R.S. had 'recently engaged in substance abuse treatment and random * * * screens.' (Decision at 13-14.) Nothing in this decision should be read to diminish the recent progress made by A.D. and R.S. toward sobriety and stability. Ultimately, however, the issue before the trial court was not the ability of A.D. and R.S. to comply with their case plans. Given the history and circumstances present in this case, the record reflects that granting the motion for permanent custody was in the best interests of the children and necessary for their welfare.").

**{¶55}** The record in this case indicates there were reasonable efforts at reunification and there is clear and convincing evidence supporting the juvenile court's decision to terminate Appellant's parental rights on the basis of inconsistent visitation to form a bond with W.W., failure to meet the goals of the case plan concerning maintaining and informing the agency of her residence, her inability to understand how to care for a child, (i.e. her "intellectual deficiencies"), and the fact that her other four children are not in her legal custody. The juvenile court committed no error (plain or otherwise) in granting permanent custody to the agency and terminating Appellant parental rights.

**{¶56}** The sole assignment of error is meritless. The juvenile court's decision is affirmed.

Donofrio, P J., concurs.

Waite, J., concurs

Case No. 21 CO 0011

---

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division of Columbiana County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**