[Cite as *In re A.M.*, 2024-Ohio-3027.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

IN THE MATTER OF: A.M.,

A DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 JE 0007

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Jefferson County, Ohio
Case No. 2024 DN 00002

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Amanda J. Abrams,* for Appellee and

*Atty. Mary F. Corabi* and *Atty. Francesca T. Carinci,* for Appellant.

Dated: August 8, 2024

**DICKEY, J.**

{¶1}   Appellant, C.T. ("Mother"), appeals from the April 17, 2024 judgment of the Jefferson County Court of Common Pleas, Juvenile Division, terminating the parental rights of Mother and J.M. ("Father") and granting permanent custody of their minor child, A.M. (d.o.b. 7/28/2016) ("minor child"), to Appellee, Jefferson County Department of Job and Family Services - Children Services Division ("Agency"), following a hearing.[1]   On appeal, Mother asserts the juvenile court erred in terminating her parental rights and granting permanent custody of the minor child to Agency.  Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2}   Mother admitted to a having a long-time addiction to drugs, tested positive for various substances including cocaine and fentanyl, and threatened to kill a caseworker.  Mother lived with and depended on her father, R.T., for financial support.  Father is a convicted felon with prior addiction issues.  Father was in prison when this case began.  After his release, Father went to a halfway house.  Father currently remains at a sober living facility in Columbus.  The minor child is autistic, non-verbal, has ADHD, and runs away.  While the minor child was in R.T.'s (his maternal grandfather) care, R.T. and Mother both admitted to giving the minor child more prescription pills than what was prescribed in order to make his behavior more manageable for them.

{¶3}   Agency first became involved with the family in June of 2021 due to alleged physical abuse regarding the minor child.  On August 30, 2021, Agency filed a complaint for temporary legal custody alleging the minor child was neglected and dependent under R.C. 2151.03(A)(2) and 2151.04(C).  The minor child was placed in foster care.  R.T. was granted legal custody in December of 2023.

{¶4}   On January 23, 2024, Agency filed a new complaint for temporary legal custody (adding R.T. as a new party to the action) alleging the minor child was dependent under R.C. 2151.04(C).   The juvenile court appointed A Child's Place CASA, Ltd.

---

[1] Father is not a named party in this appeal.

("CASA") as guardian ad litem ("GAL") for the minor child and appointed separate counsel for Mother, Father, and R.T.

{¶5} The juvenile court issued an ex parte emergency order finding probable cause to believe the minor child is dependent and granted emergency custody to Agency. Following an informal shelter care hearing, the court found cause to sustain its ex parte emergency order, finding the minor child to be dependent, and granted temporary custody to Agency.

{¶6} Adjudication and disposition hearings were held. The juvenile court found the minor child to be dependent and ordered the child to remain in the temporary custody of Agency. Agency filed a case plan and the GAL filed a report recommending that permanent custody be granted to Agency.

{¶7} Upon a dispositional request for permanent custody on the dependency complaint by Agency, the juvenile court held a final hearing on March 15, 2024. The following were present at that hearing: Mother with her counsel; Father appeared via Zoom with his counsel; R.T. with his counsel; the GAL with her counsel; and an attorney on behalf of Agency.

{¶8} The juvenile court heard testimony from a former Agency caseworker and current OhioRise care coordinator for the family; a parent aide/caseworker from Agency; a current Agency case aid; and the GAL. The GAL filed her report with the court, revealing:

> [The minor child] is autistic and will be a difficult child to parent without the proper training and resources. [The minor child] needs an extremely secure home setting and guardians that are tremendously solidly prepared to parent him. It is [in the minor child's] best interest to have Permanent Custody granted to The Agency.

(3/4/2024 Report of Guardian Ad Litem, p. 4).

{¶9} The parties stipulated to the admission of medical records. The juvenile court admitted four exhibits (State's Exhibits A-D) on behalf of Agency without objection (including correspondence from Pinnacle Treatment Centers regarding Mother; from Alex's House (a sober living facility in Columbus) regarding Father; from Genesis Health

Care System regarding the minor child's medications; and a December 29, 2023 juvenile court judgment entry designating R.T. as legal custodian of the minor child). The court also admitted seven exhibits (legal custodian Exhibits 1-7) on behalf of R.T. without objection (including medical notes regarding Dr. Ellen Kitts and the minor child).

{¶10} At the final hearing, the former Agency caseworker and current OhioRise care coordinator testified she began working with this family in November of 2021 while at Agency and on January 4, 2024 with OhioRise. (3/15/2024 Final Hearing Tr., p. 11). Agency first became involved during an initial referral received on June 12, 2021 via an emergency call from the sheriff's department. (*Id.* at p. 12). The incident occurred at a gas station where Mother was observed pulling the minor child across the parking lot and allegedly striking him in the chest while she was attempting to put him in his car seat. (*Id.* at p. 13). There were concerns for the minor child's safety as Mother has a history of drug use. (*Id.* at p. 14).

{¶11} Agency filed a motion for protective supervision on August 26, 2021. (*Id.* at p. 14-15). A police removal occurred on August 29, 2021, where the minor child was found to be unattended and in another part of the neighborhood. (*Id.* at p. 15). The minor child was placed in a foster home through Village Network. (*Id.* at p. 16). Agency was granted temporary custody on October 12, 2021 and a case plan was established. (*Id.* at p. 17-18).

{¶12} Mother had multiple positive screens for cocaine and fentanyl. (*Id.* at p. 23). On occasion, Mother would also test positive for benzodiazepines. (*Id.* at p. 26). Mother "did advise that she had long had an addiction to cocaine, and she advised that she had been smoking crack." (*Id.* at p. 27). The entire time that the caseworker/care coordinator had the case, Mother was residing with her father, R.T., and was dependent upon him financially. (*Id.* at p. 27-29).

{¶13} Attempts were made for reunification. On July 3, 2023, the minor child had his first overnight visit with Mother. (*Id.* at p. 33). The caseworker/care coordinator revealed the visits "were seemingly going fine" but Mother tested positive again for cocaine and fentanyl. (*Id.*) Thus, the minor child went back into foster care on July 28, 2023. (*Id.*) The caseworker/care coordinator indicated, "[Mother] also told me at that time that her father [R.T.] was going to file for legal custody, as the Agency at that time was

right at [the minor child] being in foster care for twenty-three months, going on twenty-four months." (*Id.* at p. 34).

**{¶14}** The caseworker/care coordinator's major concerns include: Father is still residing in a sober living house and has not been able to obtain housing for the minor child; Mother is addicted to drugs and does not have the proper ability to supervise the minor child and ensure his safety; and R.T. has physical health issues and is unable to chase after the minor child. (*Id.* at p. 36-37, 40-41, 53-54).

**{¶15}** The parent aide/caseworker testified she first started working with the minor child and Mother in February of 2022 before becoming assigned as a caseworker on September 29, 2023. (*Id.* at p. 91, 96). She supervised parent-child visits and conducted home visits. (*Id.* at p. 93-94). Mother canceled, was not consistent in attendance, and failed drug screens. (*Id.* at p. 95, 98). The parent aide/caseworker testified regarding the specific substances, dates of testing, and locations/laboratories. (*Id.* at p. 101-109). She could not verify that Mother had been employed or if she had any income. (*Id.* at p. 114). She referenced the December 29, 2023 judgment designating R.T. as legal custodian and stating, "The parties are prohibited from using any illicit drugs in the presence of [the] minor child." (*Id.* at p. 118-119). However, the parent aide/caseworker stated that contrary to that order, Mother admitted to using drugs. (*Id.* at p. 120).

**{¶16}** The parent aide/caseworker reported concerns, namely regarding 16 missing clonidine pills prescribed for the minor child which he was to take one tablet per day. (*Id.* at p. 124, 126). She testified that "[R.T.] and [Mother] both admitted to me that they were giving [the minor child] two pills a day because they wanted him to calm down." (*Id.* at p. 124). The parent aide/caseworker "called back to the Agency, and they said I needed to remove [the minor child] at that point in time, due to the fact that they were overmedicating him." (*Id.* at p. 128). The minor child went back to the foster home where he is "doing very good," has "a good routine," and is "very adjusted." (*Id.* at p. 132, 146-147). The foster home is "structured" and the foster parents are able to provide for the minor child's day-to-day needs, including his medical needs. (*Id.* at p. 146). The minor child has been in foster care for two-and-a-half-years, since 2021. (*Id.* at p. 149).

**{¶17}** The parent aide/caseworker noted two concerns regarding Father, including "housing, and if he would be able to set up daycare for [the minor child]." (*Id.* at p. 138).

She said, "I know [Father] has tried, but he has not had any success. He wants to stay where he's at. He likes his job and he would like to stay in that Columbus area[.]" (*Id.* at p. 139). Regarding Mother, the parent aide/caseworker's concerns included, "[Mother] still actively using substances and, you know, being able to take care of [the minor child]." (*Id.* at p. 151). With respect to Mother, the parent aide/caseworker also has "safety concerns" for the minor child and him being given more prescription pills than what was prescribed. (*Id.* at p. 152). The parent aide/caseworker opined that permanent custody to Agency is in the minor child's best interest. (*Id.* at p. 154).

**{¶18}** The current Agency case aide testified she is aware that housing is an issue for Father. (*Id.* at p. 224). On cross-examination, she stated that on the day of the minor child's removal, "he wasn't his self." (*Id.* at p. 225-226). He is usually "pretty hyperactive" but on that day, he was "below" the "baseline level of normal human activity." (*Id.* at p. 227-228). The case aide said the minor child's face and ankle were swollen and noticed his GPS ankle bracelet was tight. (*Id.* at p. 226-227).

**{¶19}** The GAL has 23 years' experience conducting investigations and writing reports. (*Id.* at p. 235). The GAL recommended that it is in the minor child's best interest to grant permanent custody to Agency. (*Id.* at p. 231). She provided "a lot of various reasons," including:

> [Mother's] inability to maintain sobriety over the course of a significant portion of time, that the sobriety is intermittent is, you know, problematic.
>
> [R.T.'s] ability to - - you know, has physical limitations. That is, you know, something that is a concern.
>
> And [Father], you know, doesn't have, you know, all of his life skills and he's not all situated as an adult.
>
> And [the minor child] - - due to [his] limitations with his autism and his need for pretty, pretty constant supervision, not a typical child by any stretch of the imagination. He's very atypical. I don't think I could parent [the minor child] adequately, and so - - or safely, and so you have to look through - - [the minor child] through the lens of a child that's very, very, very unique,

Case No. 24 JE 0007

and you have to make sure the caregivers would be able to manage all those unique intricacies that [he] has.

And I don't - - I think it's a very, very, very limited pool of people that would be able to parent [the minor child]. And it's, you know, unfortunate, certainly that none of the adults at this moment are able to provide that for [him].

(*Id.* at p. 231-232).

{¶20} On April 17, 2024, the juvenile court terminated Mother's and Father's parental rights and granted permanent custody of the minor child to Agency following the hearing.  In its judgment, the court found the following:

1. That the Court has jurisdiction over the parties and the subject matter of the action and that service of process was perfected upon the parties of the action;

2. That [C.T.] is the natural mother of the minor child born July 28, 2016;

3. That [J.M.] is the natural father of the minor child born July 28, 2016;

4. That the Guardian ad Litem submitted a report to the Court prior to the hearing recommending that the Court grant CSD's [Agency] Motion for Permanent Custody;

5. That the minor child is too immature based upon the age of the child to express his/her desire or for the Court to consider that desire;

6. That the maternal grandfather, [R.T.], was granted legal custody of the minor child in December 2023;

7. That there are no blood relatives available for placement or custody of the child;

8. That the maternal grandfather has stated he is unable to care for the child without the assistance of the mother;

Case No. 24 JE 0007

9. The paternal grandfather was contacted regarding placement but indicated he was unable to care for the child;

10. No other relatives were identified by the parents and no one contacted CSD regarding placement or custody of the minor child;

11. That CSD had initially established a case plan which includes parental involvement and the initial goal of reunification;

12. That the child was in CSD custody from August 30, 2021 (when Ex Parte Custody was granted to CSD) until the maternal grandfather received custody in December 2023 and the child was placed into the maternal grandfather's care on January 9, 2024;

13. That CSD received Ex Parte Custody a second time on January 22, 2024 after conducting a pill count at the maternal grandfather/mother's residence;

14. That CSD filed a new complaint alleging dependency with a request for permanent custody;

15. That the child was adjudicated a dependent child in February 2024;

16. That the matter before the Court is the disposition of permanent custody as requested in that complaint;

17. That prior to the child initially being placed into CSD custody, CSD put into effect a safety plan until an alternative response case could be started;

18. That the safety plan remained in place for approximately two (2) weeks and the child was returned to the mother;

19. That the mother worked with a parent aide, submitted to random drug tests, and the child was in protective daycare;

Case No. 24 JE 0007

20. That the mother was not compliant with the random drug tests and protective daycare;

21. That a police removal of the child was completed on August 29, 2021;

22. That CSD was granted Ex Parte Custody of the child on August 30, 2021;

23. That at the time of this removal, no relatives were available to take custody or placement of the child;

24. That CSD spoke with the maternal grandfather and paternal grandfather and both were unable to care for the child;

25. That the case was adjudicated and on October 12, 2021, CSD received temporary legal custody of the minor child through the disposition hearing;

26. That CSD filed and received an extension of temporary custody regarding the minor child on August 15, 2022 and again on February 1, 2023;

27. That the initial Case Plan required the mother to undergo a drug and alcohol assessment and follow all recommendations, utilize a parent aide, parenting time at CSD, case management, the father to undergo a drug and alcohol assessment and follow recommendations upon his release from incarceration, and the father to obtain housing;

28. That the natural mother went to New Day Recovery in October 2021 and remained there until December 2021;

29. The mother then went to Red Zone in Youngstown for drug and alcohol treatment;

30. In January 2022, the mother started treatment at Pinnacle (aka Brilliant Treatment Center) where she remained through at least September 2023;

Case No. 24 JE 0007

31. That CSD received multiple random drug tests for the mother wherein she tested positive for cocaine and fentanyl including as recently as February 28, 2024;

32. That CSD received multiple random drug tests for the mother wherein she tested negative with the most recent being January 22, 2024;

33. That CSD did not receive any records indicating the mother was discharged from treatment;

34. That CSD received letters from the provider (Pinnacle) indicating the mother's compliance or lack thereof;

35. That CSD requested the mother provide a drug test on July 23, 2023;

36. That the mother requested she be able to provide the drug test on July 25, 2023 when the SAR was scheduled for the child;

37. That the mother did provide a drug test on July 25, 2023 and said test was positive for cocaine and fentanyl;

38. That the natural mother would initially deny her drug use but would eventually admit to using drugs;

39. That the mother admitted in 2021 that she had a long time addiction to cocaine;

40. That the mother lived with the maternal grandfather throughout the life of the case;

41. That the maternal grandfather/mother's home was clean and safe;

42. That the mother depended on the maternal grandfather for financial support;

43. That the mother was compliant with parent aide services;

Case No. 24 JE 0007

44. That the mother was complying with parenting time with the child as of September 2023;

45. That the child is autistic, nonverbal, and in need of constant supervision;

46. That the child is fully dependent on others for his care;

47. That the child is very active and considered a "runner" that is why he wears an GPS ankle bracelet;

48. That the mother was fearful the child would run from her in public;

49. That CSD worked with the mother regarding this issue by moving parenting time from CSD to community locations to ease the mother's fear;

50. That in September 2022, CSD started community outings with the mother and child;

51. That in March 2023, CSD started supervised home visits with the mother and child;

52. That during the summer of 2023, the mother was complying with drug treatment and CSD was exploring a reunification of the child with the mother;

53. That in July 2023, CSD started overnight home visits with the mother and child with the intent of placing the child on leave with the mother on August 1, 2023;

54. That overall the mother's parenting time went well;

55. That on July 25, 2023, the mother tested positive for cocaine and fentanyl on a scheduled drug test and the child was returned to foster care;

56. That the mother admitted relapsing on drugs due to being fearful of the child returning home;

Case No. 24 JE 0007

57. That the mother was going to Trinity Health for detox but no information showing she actually went was received by CSD;

58. That the mother had a pattern of sobriety then relapse then sobriety then relapse again;

59. That the maternal grandfather was going to file for legal custody of the child;

60. That the natural father was in prison when the case initially started;

61. That after the father was released from prison, he went to a halfway house;

62. That after a period of time at the halfway house, the father began staying at a sober living house;

63. That the father remains at a sober living house at this time;

64. That the father is a convicted felon and has struggled to secure housing as such;

65. That the father had prior addiction issues;

66. That as of September 2023, the father had not fully complied with the case plan;

67. That the minor child cannot live in the sober living house with the father;

68. That the father has not obtained independent housing suitable for the child;

69. That CSD had no concerns regarding the maternal grandfather/mother's home;

70. That the mother was compliant with parent aide services;

71. That CSD's concern with the mother is her continued drug usage;

72. That the maternal grandfather received legal custody of the child on December 22, 2023;

73. That CSD and Ohio Rise worked to insure that all services were in place before the child went to the maternal grandfather's home;

74. That Ohio Rise insured the child's ankle monitor was set up with the Jefferson County Sheriff's Office;

75. That the schools were contacted regarding the child's enrollment;

76. That doctor appointments, dentist appointments and eye appointments were being scheduled;

77. That alarms were on the doors and windows of the maternal grandfather's home;

78. That locks were placed on the cabinets at the maternal grandfather's home;

79. That the child was placed in the maternal grandfather/mother's home on January 9, 2024;

80. That CSD did a pill count of the child's medicine on that day (January 9, 2024) with 51 pills (Clonidine 0.1mg) being turned over to the maternal grandfather;

81. That the child had a prescription for 1 tablet per day;

82. That CSD conducted another pill count on January 22, 2024 and found only 27 pills;

83. That the maternal grandfather and mother admitted giving the child more than one pill per day in order to calm the child;

84. That no current prescription was presented indicating the child's dosage was increased;

85. That a police removal was conducted on January 22, 2024;

86. That the child was not examined by a doctor on that day even though he had a previously scheduled appointment for the afternoon of January 22, 2024;

87. That the child was returned to the same foster home he was in prior to being placed into the maternal grandfather's custody;

88. That the child's prescription has not changed and remains one tablet 0.1mg per day;

89. That the maternal grandfather introduced records from Dr. Kitts/Easter Seals for the child showing his prescription permitted as many as three tablets per day for the child;

90. That these records were from March 2020 to January 2021;

91. That the child has a good routine at the foster mother's home;

92. That the child has a lot of behavioral issues at school;

93. That the child does not have the behavioral issues at the foster mother's home;

94. That the foster mother provides for the child's daily needs and medical needs;

95. That the foster parents are not willing to adopt the child but he can remain with them for as long as he needs;

96. That the child has been in foster care for approximately two and one half years except for a period of time in July 2023 when he was with the

mother and the two (2) week period in January 2024 when he was in the maternal grandfather's custody;

97. That CSD is concerned for the maternal grandfather's ability to care for the child as he has stated he cannot do it without the mother's assistance;

98. That the mother is still actively using drugs and is in the maternal grandfather's home;

99. That the father remains in a sober living house and the child cannot reside at the sober living home with the father;

100. That the minor child has bonded with the foster parents;

101. That the child cannot be safely placed with either parent within a reasonable period of time as the mother is actively using drugs with a positive test from February 28, 2024 and the father has failed to comply with the case plan by not obtaining housing suitable for the child;

102. That the minor child is in need of a legally secure permanent placement and said placement cannot be accomplished without the granting of permanent custody to CSD;

103. That the minor child is in foster care and has been since August 30, 2021 with the exception of July 2023 and two weeks in January 2024;

104. That the child has been successfully integrated into the home of the foster family;

105. That the minor child's needs are being met by the foster family;

106. That CSD has made reasonable efforts to reunite the child with the natural parents and to prevent placement of the minor child outside of the home of the natural parents;

107. That following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by CSD to assist the natural parents to remedy the problems that initially caused the child to be placed outside of the natural parent's home, the natural parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home;

108. That clear and convincing evidence has been established to warrant the granting of permanent custody of the minor child to CSD;

109. That it is in the best interest of the child to terminate parental rights and to grant permanent custody of the minor child to the Jefferson County Department of Job & Family Services-Children Services Division.

(4/17/2024 Judgment Entry, p. 2-7).

{¶21} Mother filed a timely appeal and raises two assignments of error.

## ASSIGNMENT OF ERROR NO. 1

**THE AGENCY PROVIDED ZERO EVIDENCE TO THE COURT THAT THE CHILD HAD ADDITIONAL MEDICATION OVER THE PRESCRIBED AMOUNT IN HIS BLOODSTREAM. THE AGENCY OFFERED NO MEDICAL TESTIMONY THAT THE CHILD WAS ENDANGERED BY PROOF POSITIVE THAT HE HAD BEEN OVERMEDICATED.**

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN DETERMINING THE JEFFERSON COUNTY JFS MADE REASONABLE EFFORTS TO MAKE IT POSSIBLE FOR THE CHILD TO RETURN HOME IN THE CARE AND CUSTODY OF APPELLANT.**

{¶22} In her first assignment of error, Mother argues the juvenile court's permanent custody order was against the manifest weight of the evidence because

Case No. 24 JE 0007

Agency provided no medical testimony or evidence that the minor child was overmedicated. In her second assignment of error, Mother contends Agency did not make reasonable efforts to reunify her with the minor child and failed to present an adoption plan. Because both assignments center on whether it was in the best interest of the minor child to terminate parental rights and grant permanent custody to Agency, we will address them in a consolidated fashion.

> "(T)he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972). A parent's interest in the care, custody, and management of his or her child is "fundamental." *Id.*; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). The permanent termination of a parent's rights has been described as, "[. . .] the family law equivalent to the death penalty in a criminal case." *In re Smith,* 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

*In re W.W.*, 2021-Ohio-3440, ¶ 26 (7th Dist.).

> "(A) court exercising Juvenile Court jurisdiction is invested with a very broad discretion, and, unless that power is abused, a reviewing court is not warranted in disturbing its judgment." *In re Anteau,* 67 Ohio App. 117, 119, 36 N.E.2d 47, 48 (1941). "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable [. . .]." *In re Jane Doe 1,* 57 Ohio St.3d 135, 137, 566 N.E.2d 1181, 1184 (1990), citing *State v. Adams,* 62 Ohio St.2d 151, 157, 172-173, 404 N.E.2d 144, 148-149 (1980). A juvenile court's decision to terminate parental rights and transfer permanent custody of a minor child must be supported by clear and convincing evidence. *Santosky, supra,* paragraph three of the syllabus. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations

Case No. 24 JE 0007

sought to be established. It is (an) intermediate (standard), being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal*." (Emphasis sic). *Cross v. Ledford,* 191 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

When reviewing the decision of a juvenile court to determine whether it is supported by clear and convincing evidence, "a reviewing court may not as a matter of law substitute its judgment as to what facts are shown by the evidence for that of the trial court" because the "trial judge, having heard the witnesses testify, was in a far better position to evaluate their testimony th(a)n a reviewing court." *Id.* at 478, 120 N.E.2d 118. "Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false." *Id.* "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

*In the Matter of K.J. and S.M.J.*, 2021-Ohio-4299, ¶ 29 (7th Dist.), quoting *In re T.N.T.*, 2013-Ohio-861, ¶ 14-15 (7th Dist.).

{¶23} When a motion for permanent custody is filed by a children services agency, the juvenile court's decision whether to grant permanent custody to the agency is governed by R.C. 2151.414(B)(1), the first prong of the permanent custody test, which provides:

"[T]he court may grant permanent custody of a child to [the agency] if the court determines at the hearing . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child . . . cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period and . . . the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code [to be an abused, neglected, or dependent child] or the date that is sixty days after the removal of the child from home.

R.C. 2151.414(B)(1)(a)-(e).

**{¶24}** In this case, the minor child could not be safely placed with either parent within a reasonable period of time "as [Mother] is actively using drugs with a positive test from February 28, 2024 and [Father] has failed to comply with the case plan by not obtaining housing suitable for the child[.]" (4/17/2024 Judgment Entry, p. 7, No. 101). The record reveals the minor child has been in the temporary custody of Agency for 12 or more of the past 22 consecutive months. (*Id.* at p. 6, No. 96); R.C. 2151.414(B)(1)(d).

Case No. 24 JE 0007

The minor child came into Agency's temporary custody on August 30, 2021. (*Id.* at p. 3, No. 22). "[T]he [minor] child has been in foster care for approximately two and one half years except for a period of time in July 2023 when he was with [Mother] and the two (2) week period in January 2024 when he was in the maternal grandfather's [R.T.] custody." (*Id.* at p. 6, No. 96). Thus, there is clear and convincing evidence to support the juvenile court's termination of Mother's and Father's parental rights and award of permanent custody to Agency under the first prong of the permanent custody test. R.C. 2151.414(B)(1)(a), (d).

{¶25} In addition to the first prong, "[an] agency [also] bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest." *Matter of J.C.*, 2021-Ohio-1476, ¶ 6 (7th Dist.), citing *In re B.C.*, 2014-Ohio-4558, ¶ 26. "R.C. 2151.414(D)(1) sets out a nonexhaustive list of factors the court must consider, and the court is encouraged but not required to address the factors relevant to the decision." *Matter of J.C.* at ¶ 6. R.C. 2151.414(D)(1) provides:

> In determining the best interest of a child . . ., the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period. . .;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).

**{¶26}** Mother believes "[t]he removal [of the minor child] was based on speculation" and that it "was a knee jerk reaction based on a pill count." (7/1/2024 Appellant's Brief, p. 10, 18). However, the record reveals that while the minor child was in R.T.'s (his maternal grandfather) care, R.T. and Mother both admitted to giving the minor child more prescription pills than what was prescribed in order to make his behavior more manageable for them. In fact, the parent aide/caseworker reported concerns, namely regarding 16 missing clonidine pills prescribed for the minor child in which he was to take one tablet per day. (3/15/2024 Final Hearing Tr., p. 124, 126). As stated, she testified that "[R.T.] and [Mother] both admitted to me that they were giving [the minor child] two pills a day because they wanted him to calm down." (*Id.* at p. 124). The parent aide/caseworker "called back to the Agency, and they said I needed to remove [the minor child] at that point in time, due to the fact that they were overmedicating him." (*Id.* at p. 128). Thus, there is direct evidence through witness testimony that R.T. and Mother were giving the minor child more prescription pills than what was prescribed.

**{¶27}** Mother also alleges Agency did not make reasonable efforts to reunify her with the minor child. However, the record reveals attempts were made for reunification. Again, on July 3, 2023, the minor child had his first overnight visit with Mother. (*Id.* at p. 33). The caseworker/care coordinator testified the visits "were seemingly going fine" but Mother tested positive again for cocaine and fentanyl. (*Id.*) Thus, the minor child went back into foster care due to Mother's addiction to drugs and her inability to supervise her child and ensure his safety. (*Id.*)

**{¶28}** Mother further stresses the foster family has no intention of adopting the minor child. Mother claims Agency did not fulfill its obligation of presenting evidence that adoption was a possibility and did not present an adoption plan to the juvenile court.

However, "the permanent custody statutes do not require (an agency) to prove that adoption is likely." *In re C.W.*, 10th Dist. Franklin No. 19AP-309, 2020-Ohio-1248, ¶ 76. Indeed, "R.C. 2151.414(D)(1)(d) does not require a

children services agency 'to present concrete proof that the child will be adopted if the court awards the agency permanent custody.' " *In re A.R.*, 10th Dist. Franklin No. 20AP-201, 2021-Ohio-1794, ¶ 42, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 52. Specifically, the Supreme Court of Ohio recognized that, "while a juvenile court reviewing a motion for permanent custody was at one time required to consider the child's probability of being adopted, [. . .] the current statutory framework does not expressly require the court to consider this information in making a best-interest determination." *In re T.R.*, 120 Ohio St.3d 136, 2008-Ohio-5219, ¶ 14. Therefore, even though "'(i)t is true that the likelihood that a child will be adopted may be considered in determining the child's best interest," "the statutes contemplate that all the statutory best interest factors must be considered and, although the likelihood of adoptions weighs in favor of such an award, the absence of the likelihood does not preclude the court from finding that an award of permanent custody is in the child's best interest'" *In re A.R.* at ¶ 42, quoting *In re V.B.-S.*, 10th Dist. Franklin No. 13AP-478, 2013-Ohio-5448, ¶ 51.

*In re C.B.*, 2023-Ohio-4089, ¶ 27 (3rd Dist.).

**{¶29}** Consequently, Mother's contentions are without merit. In determining the best interest of the minor child being placed into the permanent custody of Agency, the juvenile court considered and referenced 109 findings in its April 17, 2024 judgment, as addressed, before concluding: "That it is in the best interest of the child to terminate parental rights and to grant permanent custody of the minor child to [Agency]." (4/17/2024 Judgment Entry, p. 7, No. 109).

**{¶30}** Specifically, the court considered all relevant factors, including: Mother is actively using drugs; Father has failed to comply with the case plan by not obtaining suitable housing; the minor child has bonded with the foster parents; the minor child is too immature based upon his age to express his wishes; the minor child has been in foster care since August 30, 2021 with the exception of July 2023 and two weeks in January 2024; the minor child cannot be safely placed with either parent within a reasonable

period of time; the minor child is in need of a legally secure placement; and said placement cannot be accomplished without the granting of permanent custody to Agency. *See* (*Id.* at p. 2, No. 5, p. 6, Nos. 100-103); R.C. 2151.414(D)(1)(a)-(e).

**{¶31}** Turning now to determining whether a child can be placed with either parent within a reasonable period of time, or whether a child should be placed with either parent pursuant to R.C. 2151.414(E), a court "shall consider all relevant evidence" and determine "by clear and convincing evidence" that "one or more of the following exist as to each of the child's parents:"

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. . . .

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing [on the motion for permanent custody];

> . . .

> (16) Any other factor the court considers relevant.

R.C. 2151.414(E)(1)-(2) and (16).

**{¶32}** In granting permanent custody of the minor child to Agency, the juvenile court specifically found, as stated, in its April 17, 2024 judgment:

> 20. That the mother was not compliant with the random drug tests and protective daycare;

> . . .

27. That the initial Case Plan required the mother to undergo a drug and alcohol assessment and follow all recommendations, utilize a parent aide, parenting time at CSD [Agency], case management, the father to undergo a drug and alcohol assessment and follow recommendations upon his release from incarceration, and the father to obtain housing;

. . .

31. That CSD received multiple random drug tests for the mother wherein she tested positive for cocaine and fentanyl including as recently as February 28, 2024;

. . .

37. That the mother did provide a drug test on July 25, 2023 and said test was positive for cocaine and fentanyl;

38. That the natural mother would initially deny her drug use but would eventually admit to using drugs;

39. That the mother admitted in 2021 that she had a long time addiction to cocaine;

40. That the mother lived with the maternal grandfather throughout the life of the case;

. . .

42. That the mother depended on the maternal grandfather for financial support;

. . .

55. That on July 25, 2023, the mother tested positive for cocaine and fentanyl on a scheduled drug test and the child was returned to foster care;

Case No. 24 JE 0007

56. That the mother admitted relapsing on drugs due to being fearful of the child returning home;

57. That the mother was going to Trinity Health for detox but no information showing she actually went was received by CSD;

58. That the mother had a pattern of sobriety then relapse then sobriety then relapse again;

. . .

60. That the natural father was in prison when the case initially started;

61. That after the father was released from prison, he went to a halfway house;

62. That after a period of time at the halfway house, the father began staying at a sober living house;

63. That the father remains at a sober living house at this time;

64. That the father is a convicted felon and has struggled to secure housing as such;

65. That the father had prior addiction issues;

66. That as of September 2023, the father had not fully complied with the case plan;

67. That the minor child cannot live in the sober living house with the father;

68. That the father has not obtained independent housing suitable for the child;

. . .

71. That CSD's concern with the mother is her continued drug usage;

. . .

83. That the maternal grandfather and mother admitted giving the child more than one pill per day in order to calm the child;

. . .

97. That CSD is concerned for the maternal grandfather's ability to care for the child as he has stated he cannot do it without the mother's assistance;

98. That the mother is still actively using drugs and is in the maternal grandfather's home;

99. That the father remains in a sober living house and the child cannot reside at the sober living home with the father;

. . .

107. That following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by CSD to assist the natural parents to remedy the problems that initially caused the child to be placed outside of the natural parent's home, the natural parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home[.]

(4/17/2024 Judgment Entry, p. 3-7).

{¶33} The record reveals the juvenile court complied with the procedure prescribed by R.C. 2151.414. The court did not err in finding that it was in the minor child's best interest to terminate Mother's and Father's parental rights and grant permanent custody to Agency. Mother fails to establish that the court incorrectly found that the minor child could not or should not be placed with her within a reasonable period of time.

{¶34} Based on the facts presented, the juvenile court's decision does not go against the manifest weight of the evidence. The court had more than adequate facts

and sufficient testimony, as delineated above and in the judgment granting permanent custody of the minor child to Agency, to proceed with a determination that the minor child remained dependent as previously adjudicated. Clear and convincing evidence existed that the minor child shall be placed into the permanent custody of Agency as the same was in the best interest of the minor child. Thus, because the juvenile court's judgment is supported by some competent, credible evidence going to all the essential elements of the case, it will not be reversed by this court as being against the manifest weight of the evidence. The minor child deserves safety and stability at this time which can only be accomplished through permanent custody to Agency.

{¶35} Accordingly, the juvenile court did not err in finding that it was in the minor child's best interest to terminate Mother's and Father's parental rights and grant permanent custody to Agency.

{¶36} Mother's first and second assignments of error are without merit.

## CONCLUSION

{¶37} For the foregoing reasons, Mother's assignments of error are not well-taken. The April 17, 2024 judgment of the Jefferson County Court of Common Pleas, Juvenile Division, terminating Mother's and Father's parental rights and granting permanent custody of the minor child to Agency following a hearing is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

Case No. 24 JE 0007

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Jefferson County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**